Shelton R. WILLIAMS, Administrator with the Will Annexed of the Estate of H. McCullough, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 699.

United States District Court
D. Montana,
Missoula Division.

May 13, 1960.

Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for plaintiff.

Harold S. Larsen, Sp. Asst. U. S. Atty., Washington, D. C., and Krest Cyr, U. S. Atty., Butte, Mont., for defendant.

MURRAY, Chief Judge.

Plaintiff brings this action to recover the sum of $18,064.99, which represents a deficiency assessment and interest assessed by the District Director of Internal Revenue at Helena, Montana and paid by plaintiff. The deficiency was assessed on the 1953 income tax of H. McCullough after the death of said McCullough and was paid by his estate, the plaintiff herein.

The case was submitted to the Court upon a stipulation of facts and the testimony of one witness offered by the plaintiff.

From the stipulation and the testimony it appears that the transaction out of which the alleged income tax deficiency arose occurred in 1953. Prior to that time H. McCullough, together with his son and wife, owned all of the capital stock of Tobacco River Power Company, a Montana corporation, H. McCullough owning 251 shares, his son five shares and his wife one share.

In 1952, Lincoln Electric Cooperative, Inc., a corporation, entered into negotiations with the McCulloughs to purchase all of the capital stock of the Tobacco River Power Company. Lincoln Electric Cooperative, Inc., did not have the funds to purchase the Tobacco River Power Company and advised the McCulloughs that it would have to borrow the full amount of the purchase price in a lump sum from the Rural Electrification Administration, and in order to do so it would have to acquire clear title to the stock in order to provide security for such a loan.

It appears that the McCulloughs determined that they would accept $125,000 for their stock if it could be sold on an installment sale, but that if it were to be sold on a cash sale, with all of the cash being paid in one year, the price would have to be $150,000, and this was communicated to the officials of the Lincoln Electric Cooperative, Inc.

The negotiations between the McCulloughs and Lincoln Electric Cooperative, Inc., culminated in an agreement on March 15, 1953, for the sale and purchase of said 257 shares of stock for the sum of $125,000, to be adjusted, as provided in said agreement, as of the closing date. There was no provision in the agreement of March 15, 1953, as to an installment sale of the stock, and from the evidence it appears that Lincoln Electric Cooperative, Inc., was ready, willing and able to pay cash. However, on April 24, 1953, the McCulloughs and Lincoln Electric Cooperative, Inc., executed a supplemental agreement which defined the method in which payment would be made to the McCulloughs.

Under this supplemental agreement it was provided that Steve McCullough and Beatrice McCullough were to be paid in cash for their shares on the closing date immediately upon the delivery of said stock to the purchaser. With reference to H. McCullough said supplemental agreement provided:

"To H. McCullough a sum equal to 25% of $251\frac{1}{2}/257$ths of the said adjusted purchase price to be paid on the closing date immediately upon the delivery of said stock to the Purchaser, as provided in said agreement;

"That immediately upon the delivery of said stock to the Purchaser, as aforesaid, the said Purchaser will execute and deliver and create the trust, a copy of which is hereto annexed and made a part hereof, and pay to the said Trustee the entire balance of said adjusted purchase price in order to completely create and make effectual the said trust.

"Immediately upon the making of said payments and the creation of said trust, as hereinabove specified, the Sellers will thereupon execute and deliver to the Purchaser their release and discharge of said original agreement dated as of March 15, 1953, as fully satisfied and performed, and the Sellers will thereafter look to said Trustee for the

payment of the balance of said consideration pursuant to the terms of said trust."

The agreement of April 24th was executed by the McCulloughs and officers of the Lincoln Electric Cooperative, Inc., and attached to the said supplemental agreement was a form of "irrevocable transfer and trust".

Under the form of trust attached to the supplemental agreement the entire balance of the purchase price owing to H. McCullough was to be paid by Lincoln Electric Cooperative, Inc., to the Union Bank and Trust Company of Helena, Montana, as trustee and the trustee was to pay to said H. McCullough on January 15, 1954, an amount equal to 20% of the principal of said trust fund originally deposited with the trustee, and a like sum each succeeding January 15th until said trust fund had been completely paid to said McCullough. Under the trust agreement attached to the supplemental agreement, McCullough was to receive the income from said trust fund.

September 23, 1953, was the closing date arrived at by the parties, and on that date the McCulloughs signed a letter addressed to Lincoln Electric Cooperative, Inc., which stated:

"We hereby acknowledge that you have this day paid to us the sum of $123,056.59, which represents full payment of the base purchase price provided for in the agreement (hereinafter called the 'Agreement'), dated as of March 15, 1953, between H. McCullough, Steve McCullough and Beatrice McCullough (hereinafter called the 'Sellers') and Lincoln Electric Cooperative, Inc. (hereinafter called the 'Purchaser'), as consideration for the sale of all the outstanding capital stock of Tobacco River Power Company, representing ownership of the property described in Exhibit 'A' to the Agreement (hereinafter called the 'System'), as such base purchase price was increased/decreased by the following adjustments made pursuant to the Agreement:"

On that date, September 23rd, Beatrice and Steve McCullough were paid in cash for their six shares and it was determined that the price for the 251 shares of H. McCullough was $120,183.67, and Lincoln Electric Cooperative, Inc., paid to H. McCullough 25% of such amount or $30,045.93, and executed a declaration of trust and paid to Union Bank and Trust Company, as trustee, $90,137.75, being the remaining 75% of the purchase price due to said H. McCullough, and the McCulloughs transferred all of the stock to Lincoln Electric Cooperative, Inc. The sale was completed and the purchaser, Lincoln Electric Cooperative, Inc., had done all that it was required to do, and McCullough, in transferring the stock, had done all that he was required to do.

The declaration of trust executed on September 23rd, the closing date, was not in the same form as the declaration of trust attached to the supplemental agreement of April 24th, which had been approved by the McCulloughs, and there is no evidence in the record that H. McCullough ever approved the declaration of trust which was executed on September 23rd.

In the original trust instrument, approved by McCullough, the income from the trust estate was to be paid McCullough, whereas in the trust instrument actually executed September 23rd, the income was reserved to Lincoln Electric Cooperative, Inc. Furthermore, under the original trust instrument, McCullough was guaranteed the payment of a definite sum of money in dollars and cents on each payment date, whereas under the instrument executed, he was only assured payment of a percentage of the trust estate remaining in the hands of the trustee on the payment date, and because of the broad powers granted the trustee to manage the estate and invest and reinvest the estate such percentage could possibly have either been more or less than $\frac{1}{5}$ of the $90,137.75 originally deposited with the trustee.

H. McCullough prepared and filed his United States Income Tax return for the

year 1953 within the time allowed by law and likewise paid all taxes showed owing thereon on or before their due dates.

The cost basis of said stock was $25,100, and, in preparing said return, he computed his gain on said sale as follows:

| | |
|---|---:|
| Gross sales price of stock sold | $120,183.67 |
| Less: Expense of sale | 482.50 |
| Net sales price | 119,701.17 |
| Less: Cost of stock sold | 25,100.00 |
| | $ 94,601.17 |

H. McCullough thereupon reported 25% of said gain, amounting to $23,650.29, as having been received by him in 1953, and, since he had owned said stock for a period in excess of six months prior to said sale, he included 50% of said gain, or $11,825.14 in taxable income for 1953. McCullough in the years 1954, 1955, 1956 and 1957 used the same method of reporting the payments received from the trustee and paid his tax in those years accordingly. McCullough's tax returns were prepared on a cash basis and not on an accrual basis.

In 1957, the Commissioner of Internal Revenue determined that the entire gain of $94,601.17 on the sale of the stock was taxable for the year 1953 as a long term capital gain and assessed a deficiency in income tax for the year 1953, in the sum of $20,233.47. Credits allowed the taxpayer on account of taxes paid on the receipts from the trust fund in the years 1954, 1955, 1956 and 1957 reduced the deficiency to $18,064.99.

In the meantime the taxpayer, H. McCullough, died and the deficiency was assessed against his estate and was paid by the estate, and this lawsuit was instituted to recover the sum so paid.

In assessing the deficiency the Commissioner accepted the taxpayer's computation of the gain and his treatment of the same as being a long term capital gain, but determined that the taxpayer realized the entire gain in 1953, holding that the taxpayer was in constructive receipt at the time of the sale of the money paid into the trust. This determination of the Commissioner is the sole issue in controversy.

Section 44(b) of the Internal Revenue Code of 1939, provides:

"Sales of realty and casual sales of personalty. In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price (or, in case the sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term 'initial payments' means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made." 26 U.S.C.A. § 44(b).

Treasury regulation 118 promulgated under the Internal Revenue Code of 1939 provides:

"Sec. 39.42–2. Income Not Reduced to Possession.—Income which

is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition."

Plaintiff contends that, under the statute, the sale of the stock qualifies as an installment sale and that under the quoted regulation the income realized from the sale was not received by him in 1953.·

The Court is of the opinion that the facts shown in this case bring it squarely within the holding · in the cases of Kuehner v. Commissioner of Internal Revenue, 1 Cir., 214 F.2d 437, and Williams v. United States, 5 Cir., 219 F.2d 523. In this case, just as in those cases, the purchaser was ready, willing and able to pay the purchase price in full at the time the sale was made, and in fact did irrevocably pay the entire purchase price. The seller in this case, just as in those cases, at the time of the sale completely and irrevocably transferred title. In each instance the transaction was completed and nothing more remained to be done by either the buyer or the seller.

In the Williams case the trust, which was finally executed, provided that the income from the trust estate was to go to the seller, whereas in the instant case the income from the trust, under the trust agreement finally executed, was to be paid to the purchaser. However, in the form of the trust agreement which was attached to the supplemental agreement of April 24, 1953, the income from the trust, just as in the Williams case, was payable to the seller, and, as pointed out, that was the only trust agreement ever approved by McCullough. There is no evidence that McCullough was aware of the change in the provisions of the trust agreement and as a matter of fact the evidence shows that at some subsequent time the accountant of Mr. McCullough contacted Lincoln Electric Cooperative, Inc., in an attempt to have the income from the trust paid to Mr. McCullough. It therefore appears that the only trust agreement approved by McCullough brings this case squarely within the holding of the Williams and Kuehner cases.

Furthermore, in the letter written by the McCulloughs and signed by them on September 23, 1953, they acknowledge as of that time the receipt of the sum of $123,056.59 in full payment of the purchase price of the stock as provided in the agreement of March 15th.

The Court is therefore of the opinion that judgment should be entered for defendant, and counsel for defendant is directed to prepare a form of judgment in accordance with Rule 11 of the Rules of this court.