NANNIE CARR HARRIS, INCOMPETENT, ROBERT A. EUBANKS, GUARDIAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5926–68. Filed August 24, 1971.

*James B. Richmond*, for the petitioner.
*Harvey S. Jackson*, for the respondent.

### OPINION

IRWIN, *Judge:* The Commissioner determined a deficiency of $30,757.32 in petitioner's income tax for the calendar year 1964. The two issues presented for our decision are:

(1) Whether petitioner constructively received proceeds totaling $110,000 in 1964 from the sale of certain real property, thereby requiring the inclusion of these proceeds in her gross income for that year under section 451 of the Internal Revenue Code of 1954;[1] and

(2) Whether petitioner constructively received in 1964 $4,070.04 in interest income accrued on an escrow deposit, which interest was credited by the escrow agent on the escrow account ledger card on June 30 and December 31, 1964, although it was not paid to petitioner until January 5, 1965.

This case having been submitted under Rule 30, Tax Court Rules of Practice, the stipulated facts, together with the exhibits attached thereto, are incorporated herein and found accordingly.

Robert A. Eubanks (hereinafter sometimes referred to as Eubanks) has been the duly authorized guardian of Nannie Carr Harris, incompetent (hereinafter sometimes referred to as petitioner or Harris), since November 3, 1959. At the time of the filing of the petition in this case, Harris resided at the Hillcrest Convalescent Home in Durham, N.C., and Eubanks' legal residence was Route 3, Chapel Hill, N.C.

An individual income tax return for the calendar year 1964, compiled on the cash receipts and disbursements method of accounting,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

was timely filed with the district director of internal revenue, Greensboro, N.C., by Eubanks for Nannie Carr Harris.

In the spring of 1962, Eubanks entered into negotiations with Robert I. Lipton, trustee (hereinafter sometimes referred to as Lipton), for the sale of a parcel of improved real estate owned by Harris and located near the center of Chapel Hill, N.C. On May 18, 1962, Lipton and Eubanks executed a contract in connection with the sale of the Harris property, which contract provided in pertinent part as follows:

THAT subject to the terms and conditions hereinafter set forth the party of the first part [2] has contracted to sell to the said party of the second part [3] and the said party of the second part has contracted to purchase from said party of the first part a certain tract or parcel of land situate in Chapel Hill, Orange County, North Carolina * * *

\* \qquad \* \qquad \* \qquad \* \qquad \* \qquad \* \qquad \*

The terms and conditions of this sale and purchase are as follows:

First: The party of the first part agrees to file a petition with the Clerk of the Superior Court of Orange County seeking approval of this sale for the price as set forth in this contract. The obligations of all parties to this contract are conditional upon approval of the said sale by the Clerk of the Superior Court and confirmation by the Resident Judge or the Judge holding the Courts of the Fifteenth Judicial District.

Second: The agreed purchase price for said premises is ONE HUNDRED FIFTY-SIX THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($156,-500.00), it being understood and agreed that SIX THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($6,500.00) shall be paid to Fouschee-Olson [sic] Realty Company for their services in connection with this matter and the balance of ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,-000.00) shall be paid to the party of the first part.

Third: Said purchase price is to be paid as follows: ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) upon the approval of the sale by the Resident Judge or the Judge holding the Courts of the Fifteenth Judicial District, and the balance on or before the 1st day of August, 1962. Subject to the approval of the Court the party of the first part will deliver to the party of the second part a good and sufficient deed for said property upon receipt of the said purchase price, said conveyance to be free of encumbrances.

Fourth: The party of the second part shall have the right to assign his rights under this contract and said assignee of the party of the second part shall have all the rights of the party of the second part.

On May 21, 1962, the guardian filed a petition with supporting affidavits pursuant to section 33–31, N.C. Gen. Stat.,[4] with the clerk of Superior Court of Orange County, N.C. (hereinafter referred to as

---

[2] Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent.

[3] Robert I. Lipton, trustee.

[4] Sec. 33–31. Special proceedings to sell; judge's approval required.—On application of the guardian, * * * by petition, verified upon oath, to the superior court, showing that the interest of the ward would be materially promoted by the sale * * * of any part of his estate, real or personal, the proceeding shall be conducted as in other cases of special proceedings; and the truth of the matter alleged in the petition being ascertained by satisfactory proof, a decree may thereupon be made that a sale * * * be had by such person,

the clerk), seeking authority to sell the parcel of real estate owned by petitioner, and alleging, *inter alia,* as grounds therefor the low net income from the property, the insufficiency of this income to provide the amount of support needed by her, and certain debts owed by petitioner.

The clerk entered an order on the same day that the petition was filed, which provided as follows:

This matter coming on to be heard before the undersigned on the petition of Robert A. Eubanks, Guardian, and it appearing to the court that the Guardian has received an offer from Robert I. Lipton, Trustee, through Foushee-Olsen Realty Company, to purchase the property described in the petition from the Guardian for the gross sum of One Hundred Fifty-Six Thousand Five Hundred ($156,500.00) Dollars, less a commission to Foushee-Olsen Realty Company, in amount of Six Thousand Five Hundred ($6,500.00) Dollars, or a net amount to the Guardian of One Hundred Fifty Thousand ($150,000.00) Dollars, and it appears to the court that it would be for the best interest of the estate of Nannie Carr Harris, incompetent, for the property described in the petition to be sold by the Guardian at private sale for the said sum of One Hundred Fifty-Six Thousand Five Hundred ($156,500.00) Dollars gross, or One Hundred Fifty Thousand ($150,000.00) Dollars net to the estate, for the purpose of paying debts against the said estate and for re-investment.

Now, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED, that Robert A. Eubanks, Guardian of Nannie Carr Harris, incompetent, do offer the said property for sale to Robert I. Lipton, Trustee, or his assigns, for the said sum of One

*in such way and on such terms as may be most advantageous to the interest of the ward;* all petitions filed under the authority of this section wherein an order is sought for the sale * * * of the ward's real estate * * * shall be filed in the superior court of the county in which all or any part of the real estate is situated; * * * no * * * conveyance of the title [shall be] made, unless confirmed and directed by the judge, *and the proceeds of the sale * * * shall be exclusively applied and secured to such purposes and on such trusts as the judge shall specify,* provided that on and after January 1, 1968, no sales of property belonging to minors or incompetents prior to July 3, 1967, by next friend, guardian ad litem, or commissioner of the court regular in all other respects shall be declared invalid nor shall any claim or defense be asserted on the grounds that said sale was not made by a duly appointed guardian as provided herein or on the grounds that said minor or incompetent was not represented by a duly appointed guardian. * * * The procedure for a sale pursuant to this section shall be provided by article 29A of chapter 1 of the General Statutes. * * * [Emphasis supplied.]

Ch. 1, art. 29A, provides in pertinent part as follows:

Sec. 1–339.28. Public sale; confirmation of sale.—(a) No public sale of real property may be consummated until confirmed

 (1) By the resident judge of the district or the judge regularly holding the courts of the district, in those cases in which the sale was originally ordered by a judge, or

 (2) By the clerk of the superior court in those cases in which the sale was originally ordered by the clerk.

(b) No public sale of real property of a minor or incompetent originally ordered by a clerk may be consummated until confirmed both by the clerk and by the resident judge of the district or the judge regularly holding the courts of the district.

(c) No public sale of real property may be confirmed until the time for submitting an upset bid, pursuant to G.S. 1–339.25, has expired.

\* \* \* \* \*

Sec. 1–339.37. Private sale; confirmation.—If no upset bid for property sold at private sale is submitted within ten days after the report of sale is filed, the sale may then be confirmed, and the provisions of G.S. 1–339.28 (a) and (b) are applicable to such confirmation whether the property sold is real or personal * * *

Hundred Fifty-Six Thousand Five Hundred ($156,500.00) Dollars gross, or One Hundred Fifty Thousand ($150,000.00) Dollars net to the said estate; that the said Guardian file a report of his offer to this court immediately; that the said offer remain on file in this court for objections or upset bids for the statutory time of ten days and for confirmation if no objections or upset bids are filed.

Immediately below the signature and official stamp of the clerk appeared the following language written in longhand:

> Approved:
> LEO CARR
> Resident Judge 15th Judicial District

Also on May 21, Eubanks filed a report with the clerk in which he stated that, pursuant to the order entered by the clerk, he had offered the property in question to Robert I. Lipton, trustee, at a private sale and had received an offer of $156,500, $6,500 of which was payable as a commission on the sale. The report also recommended confirmation of the proposed sale by the resident judge of the district and by the clerk of the court, unless objections or upset bids were filed within the 10-day period provided by statute for filing such objections.[5]

There was no mention of the terms of payment in either the petition, the court order, or the report of the offer.

Lipton paid Eubanks $1,000 on or about May 21, 1962, as per their contract dated May 18, 1962. However, it appears that the guardian was advised at some time between May 21, 1962, and June 1, 1962, that there would be a considerable saving in income tax for Harris if the purchase price were payable in installments. Therefore, he filed a supplementary petition with the clerk on June 1, 1962, in which he sought approval of the following arrangement: Robert I. Lipton, trustee, desirous of obtaining a deed to the real estate in question free and clear of encumbrances, agreed to pay Eubanks $46,500 upon delivery of such a deed and—

to deposit with the First Federal Savings and Loan Association of Durham, N.C., as escrow agent, the sum of $110,000.00 covering the full purchase price with instructions to the said * * * Association * * * as escrow agent to pay to * * * [the] guardian on the 2nd day of January, 1963, the sum of $27,500.00 plus any accumulated interest and the sum of $27,500.00 plus accumulated interest on the 2nd day of January of the years 1964, 1965, and 1966, and in this manner * * * [the] guardian * * * can distribute the income tax for this sale over a period of five years and thereby effect a considerable savings to his ward's estate * * *

The attorney representing Eubanks sent a letter to the clerk along with the supplementary petition, in which he approximated the tax savings to Harris in reporting the receipts from the sale of the real property over a period of 5 years.

---

[5] N.C. Gen. Stat., sec. 1–339.37. See fn. 4 *supra*.

On June 1, 1962, the clerk entered an order pertaining to the supplementary petition which was approved by the resident judge of the 15th Judicial District of Superior Court of North Carolina. This order confirmed and approved the sale and authorized the manner of payment set forth in the supplemental petition as spelled out below:

This cause again coming on to be heard and being heard and it appearing to the court that under a prior order entered in this matter Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, reported to the court that he had an offer for the property described in the pleadings from Robert I. Lipton, Trustee, through Foushee-Olsen Realty Company for $156,500.00, of which sum $6,500.00 is due and payable to Foushee-Olsen Realty Company as commissions; the said report has remained on file in this office for more than ten days as required by law; no objections or upset bids have been filed and Robert A. Eubanks, guardian for Nannie Carr Harris, incompetent, has filed a supplementary petition in which he prays that he be permitted to accept a down payment of $46,500.00 and that the remainder of the purchase price be deposited by Robert I. Lipton, Trustee, or his assigns with First Federal Savings and Loan Association of Durham, N.C., as escrow agent, with irrevocable authorization to the escrow agent to pay to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, on the 2nd day of January, 1963, the sum of $27,500.00, plus accumulated interest and on the 2nd day of January, 1964, 1965, and 1966, each, the sum of $27,500.00 plus accumulated interest so that the taxable income from the sale of this property can be reported by the guardian on an installment sale basis and over a period of five years; and it appearing to the court that *it would be to the best interest of the estate of Nannie Carr Harris, incompetent, that this method of payment for the said property would be advantageous to the estate and should be approved by the court.*

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED, that the sale of the property described in the pleadings by Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, to Robert I. Lipton, Trustee, or his assigns, for the full sum of $156,500.00 be and the same is hereby in all respects confirmed and fully approved.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the said Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, be and he is hereby authorized and permitted to accept the sum of $46,500.00 in cash and Robert I. Lipton, Trustee, or his assigns, is authorized to deposit with First Federal Savings and Loan Association of Durham, N.C., as escrow agent, under an irrevocable escrow agreement the remaining sum of $110,000.00 which escrow agreement shall authorize First Federal Savings and Loan Association of Durham, N.C., as escrow agent, to pay to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, on the 2nd day of January, 1963, from the said funds $27,500.00 plus accumulated interest and on the 2nd day of January of the years 1964, 1965, and 1966, each, the sum of $27,500.00 plus accumulated interest to each date until transfer of the said funds to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, has been completed, or to the duly qualified representative of Nannie Carr Harris should she die before the escrow agreement terminates.

IT IS FURTHER, ORDERED AND DECREED, that Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, shall and he is hereby authorized, empowered and directed to execute and deliver to Robert I. Lipton, Trustee, or his assigns, a good and sufficient deed in fee simple, with taxes, insurance and rents adjusted

as of the date of the closing of this matter and upon payment of $46,500.00 and delivery to him of a copy of the above mentioned escrow agreement between Robert I. Lipton, Trustee, or his assigns, and First Federal Savings and Loan Association of Durham, N.C., relative to the balance of $110,000.00.
[Emphasis supplied.]

On or about August 1, 1962, Eubanks and Lipton executed an agreement whereby the time for the payment of the balance of the purchase price due under the contract dated May 18, 1962, was extended at Lipton's request from August 1, 1962, through December 31, 1962. Eubanks received $2,000 from Lipton, which together with the $1,000 already paid on May 21, 1962, was to be credited to the purchase price, but forfeited as liquidated damages in the event that Lipton refused to pay the balance of the purchase price on or before December 31, 1962.

It appears that sometime between August 1, 1962, and December 21, 1962, Lipton assigned all his rights in the Harris property to W. J. Darnell, George S. Goodyear, and George F. Lattimore, Jr. (these three persons hereinafter referred to as the assignees).

Thereafter, on December 21, 1962, Eubanks, in consideration of the receipt of "One Dollar ($1.00) [6] and other good and valuable considerations," executed an agreement with the assignees extending the closing date of the sale from December 31, 1962, through February 18, 1963.

On or about February 14, 1963, Eubanks, in consideration of the receipt of $2,000 from the assignees, extended the closing date through May 1, 1963, which date was further extended by Eubanks through July 25, 1963, in consideration of the receipt of $2,000 from the assignees on May 1, 1963.

A second supplementary petition pertaining to the proposed sale of real property owned by Harris was filed on August 23, 1963, with the clerk. It provided in pertinent part as follows:

That * * * [Robert A. Eubanks, guardian] has been unable to complete the sale of the said property to Robert I. Lipton, Trustee, and is now informed, believes and alleges that Robert I. Lipton, Trustee has now assigned his rights in this matter to George S. Goodyear, George F. Lattimore, Jr. and W. J. Darnell and who are now offering to purchase the said property and to pay the undersigned guardian for the property on or before the 15th day of December, 1963.

 * * * * * * *

That your petitioner is of the opinion that the actual cash payment should be made as set out in an order of this Court dated June 1, 1962, which would permit him to receive $46,500.00 in cash and the remainder of $110,000.00 through an irrevocable escrow agreement with the First Federal Savings & Loan Association of Durham, North Carolina, and in four (4) annual installments and this arrangement would effect a sizable tax savings for your petitioner's ward's estate.

 * * * * * * *

[6] This finding is in accord with Exh. 11–K, which is a copy of the agreement, but is contrary to the stipulation which stated that the consideration for this agreement was $2,000.

That your petitioner is informed and believes that it has been a difficult matter to get all of the legal problems involved in the sale by him and the purchase by others of this property and the said George S. Goodyear, George F. Lattimore, Jr. and W. J. Darnell have informed your petitioner that they have arranged through Goodyear Mortgage Corporation to finance the purchase of this property and the erection of a multiple unit motel and business building on the said property and in the sum of $850,000.00 and that they will authorize Lee W. Settle, Trustee in the deed of trust securing the said indebtedness to Goodyear Mortgage Corporation, and the Goodyear Mortgage Corporation to pay the first funds disbursed by the said mortgagee in payment of the purchase price on the said property of $46,500.00 and as set out above and the said Goodyear Mortgage Corporation will accept the said instructions and agree to pay the said sum to your petitioner and on or before December 15, 1963, and deposit the balance of $110,000.00 under an irrevocable escrow agreement as stated above.

WHEREFORE, your petitioner prays that he be authorized, empowered and directed to execute a fee simple deed conveying the property described in the pleadings to George S. Goodyear, George F. Lattimore, Jr. and W. J. Darnell and that he be authorized and permitted to enter into a contract with the said purchasers, their spouses, Lee W. Settle, Trustee, and Goodyear Mortgage Corporation guaranteeing to him payment of the purchase price of the said property on or before December 15, 1963 by a first lien contract on the said property, and that he be authorized, empowered and directed to do all other things necessary to complete this transaction.

On August 23, 1963, the clerk entered an order with respect to this second supplementary petition which—

ORDERED, ADJUDGED AND DECREED that Robert A. Eubanks, Guardian of Nannie Carr Harris, incompetent be and he is hereby authorized, empowered and directed to execute a fee simple deed to the property described in the pleadings to George S. Goodyear, George F. Lattimore, Jr. and W. J. Darnell and is further authorized, empowered and directed to enter into a contract with the said parties, their spouses, and Lee W. Settle, Trustee and Goodyear Mortgage Corporation to the effect that the first monies disbursed by Goodyear Mortgage Corporation on the * * * [demand] note [7] of $850,000.00 shall be paid to Robert A. Eubanks Guardian of Nannie Carr Harris, incompetent, and on or before December 15, 1963 and he may provide in that contract for the payment of $46,500.00 on or before the said date and for the payment of the remainder through an escrow agreement over a period of four (4) years as set out in an order of this Court dated June 1, 1962, and he is further authorized and directed to see that his deed to George S. Goodyear, George F. Lattimore, Jr. and W. J. Darnell, the deed of trust securing an indebtedness to Goodyear Mortgage Corporation, and an agreement relative to payments are filed for registration simultaneously in the Office of the Register of Deeds of Orange County and to see that there are no other intervening liens against the said property.

This order was approved by the resident judge of the court on the same day that the order was entered by the clerk.

Eubanks, the assignees, Lee W. Settle, trustee (hereinafter referred to as Settle), and Goodyear Mortgage Corp. (hereinafter the Mort-

---

[7] The assignees executed a demand note in the amount of $850,000 payable to the Goodyear Mortgage Corp. See p. 1173 *infra.*

gage Corp.) executed an agreement on August 31, 1963, which agreement contained substantially the same provisions for payment as outlined in the supplementary petition of June 1, 1962, and the second supplementary petition of August 23, 1963. In particular, this agreement stated:

WHEREAS, the parties of the first part desire to provide for the payment of the purchase price for the said property on or before December 15, 1963 and desire to protect the said Robert A. Eubanks, Guardian of Nannie Carr Harris, incompetent, and

\* \* \* \* \* \* \*

WHEREAS, the party of the second part desires to collect on the purchase price during this calendar year only the sum of $46,500.00, less any deposits, and desires to defer the payment of the remaining $110,000.00 over a period of four (4) years and according to a judgment of the Clerk of Superior Court of Orange County dated June 1, 1962 by the depositing by one or more of the parties of the first part of the sum of $110,000.00 with the First Federal Savings & Loan Association of Durham, North Carolina, under an irrevocable escrow agreement.

The parties further agreed that the first installment under the escrow agreement was to be paid on January 2, 1964, rather than on January 2, 1963, as provided in the June 1, 1962, order and that each of the three other installments was to be paid on January 2 of the years 1965, 1966, and 1967, respectively.

In the event that the purchase price was not deposited according to the terms of the agreement, the assignees agreed to reconvey title to the property free and clear of any encumbrances to petitioner, and the Mortgage Corp. agreed to cancel the demand note and deed of trust which the assignees had executed and delivered to the Mortgage Corp., thereby placing all parties in status quo.

On or about August 31, 1963, Eubanks executed a deed for the Harris realty to the assignees, which deed was recorded in the Office of the Register of Deeds, Orange County, N.C. (hereinafter Office of the Register of Deeds), on September 5, 1963.

On or about the same date, the assignees executed a deed of trust on the Harris property to Settle as security for a demand note payable to the Mortgage Corp. in the amount of $850,000. This deed of trust was also recorded in the Office of the Register of Deeds on September 5, 1963.

Lipton executed an assignment of—

all of the right, title and interest of \* \* \* [Lipton] in and to all options, contracts and any other interest which \* \* \* [he] might have \* \* \* in and to that contract dated 18 May 1962 \* \* \*, together with all extensions thereof.

This assignment was executed on September 5, 1963, and recorded in the Office of the Register of Deeds on the same day.

Other events transpired on or about January 17, 1964, which are important to the resolution of the issues in this case.

An escrow agreement was entered into between Settle and the First Federal Savings & Loan Association of Durham, N.C. (hereinafter First Federal), on January 17, 1964. The agreement provided as follows:

WHEREAS, *the order of the Clerk of the Superior Court of Orange County and approval by the Resident Judge of the Fifteen Judicial District of the Superior Courts of North Carolina, authorized and permitted the party of the first part to deposit the balance of the purchase price and in the sum of $110,-000.00 with the party of the second part, as Escrow Agent, and under the following irrevocable terms and conditions, to-wit:*

1. The Escrow Agent shall receive the said sum of $110,000.00 from the said Lee W. Settle, Trustee, and shall hold said funds, and shall credit any interest thereto as authorized to be paid, from time to time, by its Board of Directors;

2. Shall pay to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, on January 2, 1965, the sum of $27,500.00 and any accumulated interest on the full amount;

3. Shall pay to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, on January 2, 1966, the sum of $27,500.00 and any accumulated interest on the balance;

4. Shall pay to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, on January 2, 1967, the sum of $27,500.00 and any accumulated interest on the balance;

5. Shall pay to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, on January 2, 1968, the balance of $27,500.00 and any accumulated interest on the balance;

\* \* \* \* \* \* \*

NOW THEREFORE, for and in consideration of the benefits accruing to the parties hereto the said Lee W. Settle, Trustee, has this day deposited with the First Federal Savings and Loan Association of Durham, N.C., Escrow Agent, the sum of $110,000.00, which said sum the First Federal Savings and Loan Association of Durham, N.C., Escrow Agent, hereby accepts and as such Escrow Agent agrees to hold said fund for Lee W. Settle, Trustee; agrees to credit such interest as shall be declared by its Board of Directors to the said funds and agrees to make payments to Robert A. Eubanks, guardian of Nannie Carr Harris, incompetent, or his successor in office, or the duly appointed personal representative of Nannie Carr Harris, should she die before January 2, 1967, the sums as set out herein and on the dates specified herein.

IT IS FURTHER UNDERSTOOD AND AGREED, that the terms and conditions of this agreement are irrevocable and that neither Lee W. Settle, Trustee, nor his successor in office or assigns shall have the right to withdraw any of the funds deposited according to the terms of this agreement or any interest which may accrue thereon.

[Emphasis supplied.]

Eubanks received the sum of $40,500 from Settle toward the purchase price on or about January 17, 1964. On or about the same day, Eubanks executed and delivered a document to the assignees, Settle

1174

and the Mortgage Corp., which purported to release the latter parties from any further liability under the agreement of August 31, 1963.

From and after January 17, 1964, the First Federal maintained an account, viz, SS09884, entitled "First Federal Savings & Loan Association of Durham, N.C. Escrow Agent Under Agreement with Lee W. Settle Trustee dated 1–17–64 Durham, N.C." (hereinafter Harris escrow account), covering the initial deposit of $110,000. During the years 1964 through 1967, the First Federal credited to the aforesaid account interest accrued or earned with respect to the balance of the fund on deposit. In particular, interest was credited to petitioner's ledger card on June 30 and December 31, 1964. This interest totaled $4,070.04. On or about January 2 in each of the years 1965 to 1968, inclusive, the First Federal disbursed from said account the principal sum of $27,500 and the accrued interest on said account to Eubanks in accordance with the terms of the escrow agreement.

The parties have agreed that, for the purpose of determining gain or loss from the sale or other disposition of the aforementioned real property, the basis which Harris had therein was $6,000 at all times pertinent to this case.

The primary issue for our determination is whether the $110,000 in sales proceeds deposited in the irrevocable escrow account was constructively received by petitioner in 1964. We must also decide whether $4,070.04 in interest credited to the escrow deposit during 1964, but not payable according to the terms of the escrow agreement until January 2, 1965, was constructively received by petitioner in 1964.

Before deciding the aforementioned issues, it is necessary to clarify some confusion emanating from respondent's brief. On brief, respondent states that—

The question to be decided by the Court is whether for the taxable year 1964 and the following years the petitioner correctly reported the proceeds from the sale of real property on the installment sale basis under the provisions of § 453 * * *. Respondent contends that the installment sales provisions are not applicable since the entire amount of the proceeds was constructively received by the petitioner in the year of the sale.

Respondent appears to rest his whole case with respect to section 453 on the determination of the issue of constructive receipt. However, we find no issue presented in 1964 as to the propriety of petitioner's using the installment sales provisions.

We find no reference in respondent's notice of deficiency that petitioner is not entitled to report the sale in question under the installment sale provisions. Instead, the notice states that respondent determined that petitioner constructively received in 1964 $150,500 in proceeds

from the sale of certain real property. Respondent admitted therein that $6,000 of proceeds was received in an earlier year. He also computed the gain realized in 1964 by using a gross profit factor of 92.5 percent. This indicates to us an admission by respondent that petitioner properly reported the sale and elected to use the installment provisions in 1963.

A further indication of this is that the taxpayer, in her petition, asserted that she reported the receipt of $5,000 on her 1963 income tax return from the sale in question and made an election to report said sale on the installment basis. Petition, par. 5A.8. In his answer and on brief, respondent admitted this allegation. Nevertheless, he assumes on brief that 1964 is the "year of sale" without further discussion of the matter.

While acknowledging that a taxpayer who desires to use the installment method cannot receive payments exceeding 30 percent of the selling price in the "year of sale" of the property involved, section 453(b)(2)(a), *Williams* v. *United States*, 219 F. 2d 523 (C.A. 5, 1955), we feel that respondent was mistaken in his determination that 1964 is the "year of sale" in this case.

The sale of the Harris property was complete in every practical way in 1963. A deed was executed and delivered to the vendees in that year. In short, all the burdens and benefits of ownership were assumed by them. The purchase price was fixed and the vendee was under the unconditional obligation to pay it under the terms set forth in the contract. See *Nina J. Ennis*, 17 T.C. 465 (1951). The sale was completed in 1963 and was subject to a condition subsequent that the vendees pay the purchase price as agreed.

Since there were at least two payments toward the purchase price made in 2 different years, viz, one in 1963 and one in 1964, the sale qualified under section 453 in 1963, the year in which petitioner reported the receipt of $5,000 in sales proceeds and elected to use the installment sale provisions. *10-42 Corporation*, 55 T.C. 593 (1971).

We shall now proceed to resolve the issues before us bearing in mind that cases of constructive receipt are essentially factual. *Avery* v. *Commissioner*, 292 U.S. 210 (1934); *C. H. Becker*, 14 T.C. 361 (1950).

## 1. *Treatment of Sale Proceeds*

Section 451(a) states the general rule for determining the taxable year of the inclusion of income as follows:

The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

The regulations [8] provide that income is treated as constructively received by a taxpayer, although not actually reduced to his possession, when it is set apart for him, or otherwise made available to him without substantial restrictions or limitations.

Several basic legal principles must be considered and applied to the facts of the case now before the Court.

Although a taxpayer has the right to minimize his Federal income tax obligations, *Gregory* v. *Helvering*, 293 U.S. 465 (1935), under the doctrine of constructive receipt, he may not defer, by private agreement, the receipt of income from one taxable year to another after the income comes within his control. *Basil F. Basila*, 36 T.C. 111, 116 (1961); *Richard R. Deupree*, 1 T.C. 113 (1942). See also *Oliver G. Willits*, 50 T.C. 602, 612 (1968); *Hamilton Nat. Bank of Chattanooga, Administrator*, 29 B.T.A. 63, 67 (1933). Where income is unqualifiedly made available to a taxpayer in a given year and where the failure to actually receive it is a result of nothing other than the taxpayer's own inaction, then such income is treated as having been constructively received during that year. *United States* v. *Pfister*, 205 F. 2d 538 (C.A. 8, 1953); *Helvering* v. *Gordon*, 87 F. 2d 663 (C.A. 8, 1937); *Oliver* v. *United States*, 193 F. Supp. 930 (E.D. Ark. 1961).

Respondent contends that petitioner exercised dominion over the sales proceeds by electing to have them placed in an escrow account. In his brief, respondent makes the following statements:

> Respondent's position is that the entire consideration was constructively received in 1964 since it was within the power and control of the petitioner to have received the funds at that time.

> * * * * * * *

> It is the respondent's position that the circumstances of this case are such that, when the purchase price was paid into the escrow account for the benefit of the petitioner, there was constructive receipt of the full amount. When negotiations were completed and the contract entered into on May 18, 1962, it was the intention of both parties that the sale would be a cash transaction. On that date petitioner was ready, willing and able to close the transaction for a cash payment of $156,500. On the day the sale was approved by the Court, petitioner became equitably entitled to the full purchase price. This contractual right was an asset which he could sell or otherwise transfer. It was within petitioner's power and control to receive the purchase in cash, but instead he elected to have it delivered to the bank under an escrow agreement.

---

[8] Sec. 1.451–2. Constructive receipt of income.

(a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

Underlying respondent's rationale is the assumption that petitioner had an enforceable right on June 1, 1962, to receive in cash the total sales proceeds and that she then decided to put herself voluntarily under some legal disability with respect to payment, viz, the escrow arrangement. Therefore, we must resolve the question of whether petitioner had an unconditional and enforceable right to receive payment in cash for the sale of her property as of the day the sale was approved by the court, or whether the court decree of June 1, 1962, bound the parties involved to use the escrow arrangement in completing the sale. See *Glenn* v. *Penn*, 250 F. 2d 507 (C.A. 6, 1958) ; *Oliver* v. *United States, supra.*

It is axiomatic that the Federal power to tax income is not subject to State control. *Commissioner* v. *Tower*, 327 U.S. 280 (1946) ; *Burnet* v. *Harmel*, 287 U.S. 103 (1932). State law creates legal interests, but the Federal statute determines when and how they shall be taxed. *Burnet* v. *Harmel, supra.*

Since petitioner is an incompetent and since the disposition of any part of her estate by her duly appointed guardian, Robert A. Eubanks, is very carefully regulated under the law of North Carolina, wherein she resides and wherein the real property in question is located, we must first determine her rights under that law.

The U.S. Supreme Court has held that a Federal court is bound only by decisions of the highest court of the State in a situation such as this where Federal tax consequences turn upon the determination of a taxpayer's rights under State law. *Commissioner* v. *Estate of Bosch*, 387 U.S. 456, 463 (1967). See also *Oliver G. Willits, supra.* If there is no decision by the highest court of the State, Federal courts, after giving "proper regard" to relevant rulings of other courts of the State, must apply what they find to be the State law. *Commissioner* v. *Estate of Bosch, supra.*

Our independent examination of the law of North Carolina reveals that the proceedings dealing with the sale of petitioner's property were authorized and, indeed, required by State law. Moreover, the decrees emanating from these proceedings were binding upon the parties involved therein.

Respondent asserted on brief that petitioner was ready, willing, and able to close the transaction for a cash payment of $156,500 on May 18, 1962, the date of the original contract of sale. However, that contract created no enforceable rights with respect to the Harris property or the purchase price in either petitioner or the prospective buyer because, under North Carolina law, the sale of a ward's estate is not allowed except by order of court, which order must have the supervision, approval, and confirmation of a resident judge of the Superior

Court of North Carolina or of a judge regularly holding court in the district. N.C. Gen. Stat., secs. 1–339.28, 1–339.37, 1–339.38, and 33–31.

In construing these statutes, the Supreme Court of North Carolina has held that when a guardian of an incompetent person sells real property under order of the court, he is merely an agent of the court and the sale is not consummated until it is confirmed by the resident judge which represents the consent of the court to the sale. *Pike* v. *Wachovia Bank and Trust Company*, 274 N.C. 1, 161 S.E. 2d 453 (1968).

The parties to the contract were cognizant of the limitations placed upon the guardian with respect to the sale of his ward's property and provided in the contract of sale dated May 18, 1962, that the—

obligations of all parties to this contract are conditional upon approval of the said sale by the Clerk of the Superior Court and confirmation by the Resident Judge or the Judge holding the Courts of the Fifteenth Judicial District.

We have reviewed the decisions of the Supreme Court of North Carolina, as called for in *Bosch, supra*, and we conclude that under the law of North Carolina, as interpreted by that court, Eubanks was merely acting for the Superior Court in contracting with Lipton for the sale of his ward's real property. His conduct with respect thereto was subject to careful scrutiny and regulation. Furthermore, the May 18 contract of sale was not binding on the parties unless the sale was confirmed by the resident judge. The modification of that contract contained in the decree of June 1, 1962, which authorized and ordered the use of the escrow arrangement, was likewise binding on them. The order of the resident judge approving the sale was, we feel, clearly within his authority. It represented the consent of the court and was granted in the discretion of the court. *Pike* v. *Wachovia Bank and Trust Company, supra; Harrell* v. *Blythe*, 140 N.C. 415, 53 S.E. 232 (1906) ; N.C. Gen. Stat., sec. 1–339.28.[9]

---

[9] In *Joyner* v. *Crisp*, 158 N.C. 199, 73 S.E. 1004 (1912), an action to set aside a contract, the Supreme Court of North Carolina held that an option contract to convey the fee simple interest in certain lands, in which the plaintiff owned a life interest and which, after her death, belonged to her children who were minors, could not be specifically performed nor could damages be recovered for failure of performance by plaintiff because the plaintiff had no power to enter into a contract to sell her children's land, where the prospective buyer knew that the land belonged to plaintiff's children. The option was made subject to obtaining a decree as required by State law in court confirming the fee and ordering conveyance of the land to be made to the prospective purchaser. The court stated :

"The plaintiffs in this case had no power to enter into a contract to sell their children's land, and a mere promise to resort to a court for the purpose of decreeing a sale of it cannot possibly be enforced, for it is beyond the power of the plaintiffs to predicate what the judgment of the court may be. Upon this principle it is held that a party cannot recover upon a contract wherein a guardian * * * agreed to institute and to carry through court proceedings necessary to the consummation of a sale or exchange of such property. * * * [158 N.C. 199, 73 S.E. 1004, 1005.]"

The court and the guardian were required to act in the best interests of the ward. N.C. Gen. Stat., sec. 33–31.[10] In view of this, it seems clear that the court had the discretion, either upon request of the guardian or upon its own initiative in an effort to conserve the incompetent's estate through tax savings, to order that the payment of the purchase price be made according to the escrow arrangement which has been out in the facts. Furthermore, we are convinced that the decree would be affirmed by the Supreme Court of North Carolina.

Contrary to respondent's assertion on brief, we find that petitioner did not have power and control over the proceeds of the sale once the Superior Court confirmed the sale and its terms. The cases cited by respondent in support of his position are distinguishable on their facts.

Recognizing that they were bound by the decree of June 1, 1962, petitioner and the assignees subsequently agreed upon the distribution of the sale proceeds as provided therein. The parties were bound by that decree and by the subsequent decree of the Superior Court dated August 23, 1963, which extended the period for completion of the sale originally set out in the earlier decree of June 1, 1962. Under these decrees, the original buyer, Lipton, or his assignees could refuse to pay the sale proceeds and petitioner could refuse to receive the proceeds except as provided therein.[11]

Under the peculiar facts and circumstances of the case before us, we hold that petitioner did not constructively receive in 1964 the $110,000 which was deposited in an irrevocable escrow account on January 17, 1964. Cf. *Oliver G. Willits, supra.*

We wish to make it clear that we are in no way implying that State law is determining herein how and when legal interests or rights are to be taxed. The Superior Court decrees in question did not in and of themselves determine the Federal tax consequences in this case. Rather, they fixed and determined petitioner's rights to the proceeds from the sale of her property. In particular, although Harris possessed the right to receive the total purchase price as of June 1, 1962, she could only receive this money over a period of years and, in this respect, her right to the proceeds was substantially restricted.

The taxpayer in this case could not have unconditionally obtained directly in cash on January 17, 1964, the entire purchase price which the buyers irrevocably placed in escrow. Cf. *Rhodes* v. *United States*, 243 F. Supp. 894 (W.D. S.C. 1965).

---

[10] See fn. 4 *supra.*

[11] We realize that the closing date of the sale was extended beyond the date originally ordered by the Superior Court. However, these extensions were made at the request of Lipton and his assignees who were apparently not able to consummate the sale on the dates originally agreed upon.

Although we are well aware that the use of an escrow account has been held in proper circumstances to constitute a mere device which can be ignored, *Rhodes* v. *United States, supra; Williams* v. *United States,* 185 F. Supp. 615 (D. Mont. 1960) ; *Williams* v. *United States,* 219 F. 2d 523 (C.A. 5, 1955), this is not such a case because here the terms of the escrow agreement, while suggested by petitioner's guardian, were dictated and ordered by the Superior Court of North Carolina. The escrow arrangement was the tool implemented by that court to prevent petitioner from receiving in cash the total sales proceeds. It is important to remember that the thrust of its binding and valid decrees was to effectively limit and restrict Harris' right to receive the money in question in 1964.

### 2. *Interests on Escrowed Funds*

Pursuant to the terms of the escrow agreement, petitioner withdrew in January 1965 the sum of $27,500 plus the accumulated interest thereon in the amount of $4,070.04. This interest had been credited by the bank to petitioner's ledger card on June 30 and December 31, 1964.

Respondent alleges that this interest was constructively received by petitioner in 1964, citing section 1.451–2(b),[12] Income Tax Regs., in support of his contention.

For the same reasons enunciated in connection with the treatment of $110,000 in sales proceeds, we hold that petitioner did not constructively receive the interest credited by the escrow agent to her account. The interest, according to the court order of June 1, 1962, was to be paid together with $27,500 of sales proceeds in January of each year following the year in which the interest was earned. Petitioner did not have the right to demand payment of the interest earned in 1964 prior to January 2, 1965.

To reflect the concessions of the parties and the above conclusions,

*Decision will be entered under Rule 50.*

---

[12] Respondent cited sec. 1.451(b), Income Tax Regs., but we feel there was a clerical omission of the subpar. number "2" before "b".