Clair E. **ROBERTS** and Betty B. Roberts, Petitioners-Appellees,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

No. 79–7277.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 9, 1981.

Decided April 23, 1981.

Charles P. Duff, Duffy, Georgeson, Kekel & Benner, Portland, Or., for petitioners-appellees.

Gilbert E. Andrews, Chief Appellate Sec., Tax Div., Dept. of Justice Washington, D.C., for respondent-appellant.

Before MERRILL and KENNEDY, Circuit Judges, and HEMPHILL,* District Judge.

MERRILL, Circuit Judge:

The Commissioner has taken this appeal from a decision of the Tax Court respecting the extent of Taxpayer's taxable income.[1] The question presented is whether gain realized from sales of stock to a trust established by Taxpayer could be reported on the

---

* Honorable Robert W. Hemphill, Senior United States District Judge of the District of South Carolina, sitting by designation.

1. (Page 1) Betty B. Roberts is the wife of Clair E. Roberts. She is a party to the proceedings because she joined in the filing of income tax returns for the years in question. "Taxpayer" will refer to Clair Roberts.

installment method provided by § 453(a)(1) of the Internal Revenue Code of 1954, 26 U.S.C. § 453(a)(1).[2] For the years 1971 through 1973, the Commissioner disallowed installment treatment of Taxpayer's stock sales and determined deficiencies in payment of income tax amounting to $344,168.22.

Taxpayer began an association with Sambo's Restaurants, Inc., in 1961, and over the years acquired a substantial block of stock in that company for which his initial and only cash contribution was $200. Ralph Roberts, Taxpayer's brother and one of the co-founders of Sambo's, had for some time acted as Taxpayer's investment adviser. By 1971, on his brother's advice, Taxpayer had determined to diversify his holdings. From 1971 through 1973 he sold over one million dollars worth of Sambo's stock on the open market, paying full capital gains tax on the sale proceeds. These sales are not in issue.

On June 2, 1971, on the advice of his brother, Taxpayer and his wife, as trustors, and his brother and his accountant, as trustees, entered into an irrevocable declaration of trust with trustors' three children as beneficiaries. On that date, the trustors transferred $2,500 in cash to the trustees. The trustors reserved no right to revoke, terminate, alter or amend the trust in any manner, and they retained no power to direct the trust's investments. The trust is to continue until 1991, at which time the remaining assets will be distributed equally among the three children.

Through 1971 and 1972, in four separate transactions, Taxpayer sold to the trust 25,921 shares of the common stock of Sambo's Restaurants, Inc., for a total price of over one million dollars. The price fixed on the occasion of each sale was the day's net selling price on the American and Pacific Coast Stock Exchanges. The date of each sale and number of shares sold was fixed by Ralph Roberts in accordance with his opinion as to the market for the stock. A typical transaction followed this procedure: Ralph Roberts would place for sale, through his broker, the number of shares he regarded as due to be sold. The price on the sale of stock from Taxpayer to the trust would then be fixed at whatever price the shares had been sold for on the open market that day. The stock certificates would be forwarded to the broker in due course, and the proceeds of sale on the market would be received by the trustees. For each sale of stock to the trust, the trustees gave their note to Taxpayer for the purchase price, payable in quarterly installments over a twenty-year period with interest at 5 percent on the deferred balances. To comply with the requirements of § 453(b), the trust's payment to the Taxpayer for the year of sale was less than 30 percent of the total selling price.

The gains realized by Taxpayer from the sales to the trust were reported by him only as to the installment payments received from the trust during the taxable year in accordance with § 453. On the Commissioner's disallowance of this method of reporting gain and his determination of deficiencies, Taxpayer petitioned the Tax Court for review. The Tax Court ruled in Taxpayer's favor and this appeal was taken by the Commissioner. We affirm.

■ The general rule respecting the reporting of capital gain on the sale of property is that it will be recognized for tax purposes in the year of sale. Section 453

---

2. (*Page 1*) § 453(a)(1) reads:

"In general—Under regulations prescribed by the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price."

Section 453 was recently amended by the Installment Sales Revision Act of 1980, Pub. L.No. 96–471, 94 Stat. 2247 (1980). Subsection (e) was added to § 453 restricting installment sales treatment for certain resale transactions involving related persons. Because the effective date of that provision is for first dispositions made after May 14, 1980, we need not consider its applicability to this appeal.

provides an exception by allowing deferral of taxation on gain realized by installment sales. The purpose of the section is to provide relief for taxpayers by matching the payment of tax to the actual receipt of sale price, thus eliminating the hardship resulting when tax must be paid on sums not yet received by the taxpayer. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503, 68 S.Ct. 695, 699, 92 L.Ed. 831 (1948). The Tax Court ruled that Taxpayer had brought himself within the exception. It relied on *Rushing v. C.I.R.*, 441 F.2d 593 (5th Cir. 1971).

In *Rushing* it was held, "[I]n order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds or possess the economic benefit therefrom." 441 F.2d at 598. In this case the Tax Court ruled that taxpayer had met the *Rushing* test: by his sale to the trust he had relinquished all control over the proceeds of the market sale and, after his sale to the trust, he possessed no economic benefit from the market sale proceeds.

The Commissioner contends that Taxpayer constructively received the benefit of the full amount of the market sale proceeds and thus should be taxed immediately on that amount in the year of sale. He asserts that here, unlike *Rushing*, the trust was used only as a conduit for the sale of Sambo's stock on the open market. He asserts that it was always contemplated that the trustees would immediately resell the Sambo's stock on the market; that the trust mechanism was part of a prearranged plan to defer recognition of immediately taxable gains from that sale. In support of this "conduit" theory, the Commissioner stresses that the sale on the open market took place before the sale price to the trust was established. Only after the stock was sold on the market would the trustees execute a prom-

issory note to the Taxpayer in the exact amount of the market price.

■ At the outset it is important to note, as did the court in *Rushing*, what this appeal is not about. *See Rushing, supra*, at 597. The case does not involve an effort to convert what would be ordinary income into capital gain, nor is it an attempt by a taxpayer to shift the gain to another taxable entity so as to have the gain taxed at a lower rate. As in *Rushing*, the only question is whether the full amount of the gain is taxable in the year of the sale or whether the exemption provided by § 453 is available. Upon this question we agree with the Tax Court that *Rushing* is in point and is sound law. The dispositive issues in our judgment are whether the trust was an independent entity of real substance and whether the sale to it was an actual sale. We hold that on both questions the answer is yes.

It cannot be denied that Taxpayer had no control over the trust or the trustees. It cannot be denied that he had no way of reaching or controlling the trust corpus. He had actually and effectively foregone the benefits of the market sale proceeds, electing instead to receive the use and enjoyment of the installment payments. This was not a sham transfer of benefits. In that respect it is to be distinguished from *Griffiths v. Commissioner*, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319 (1939), where the intermediary was a corporation wholly owned by the taxpayer, and *Williams v. United States*, 219 F.2d 523 (5th Cir. 1955), where the intermediary was a bank escrow, irrevocable by the purchaser, with the taxpayer-seller as beneficiary.[3]

Given the character of the trust, in our judgment the Commissioner misconceives the significance of the connection between the sale to the trust and the market sale, and the fact that the parties on each sale to

---

**3.** (*Page 5*) The recent case of *Lustgarten v. C.I.R.*, 639 F.2d 1208 (5th Cir. 1981), was another case of bank escrow as intermediary. Sale of the stock in question had been to the taxpayer's son. The court held the taxpayer to have had constructive receipt of the sale proceeds in full in the year of sale. *Rushing* was distinguished in that the Lustgarten sale proceeds were not placed in an irrevocable trust but in an escrow account, terminable by agreement between the taxpayer and his son, and in the management of which the son was not free from control of the taxpayer.

the trust contemplated that the stock would be promptly resold on the market. The trust would be "mere conduit" only if it allowed Taxpayer to secure the control and benefit of the proceeds of the sale on the market as if he had himself sold it directly to the ultimate purchasers. Taxpayer did not have this power over the proceeds. Moreover, it should be noted that although resale on the market was contemplated, the trustees were under no obligation to so act. Had Ralph Roberts thought that retaining the Sambo's stock in the trust portfolio would be desirable he was perfectly free, as trustee, to retain it.

The Commissioner overlooks the fact that with regard to the sale and resale, Taxpayer was motivated in two ways: by his own interest in diversifying his holdings; and by his desire, as trustor, to co-operate with the trustees to ensure that the trust corpus would be soundly invested for the benefit of his children. (His brother, in his dual capacity as Taxpayer's investment manager and trustee of the trust, had the same two concerns.) Once the sale of stock was made to the trust, Taxpayer no longer had any personal interest in its sale on the market, save as that sale should determine the sale price to the trust. Sale on the market was not for Taxpayer's benefit but was for the benefit of the trust in securing diversification of the corpus.

So long as the trust had real substance as an independent entity, it is of no consequence that Taxpayer's election to take in installments (and to forego the balance of the benefits of sale) was wholly voluntary on his part and done with income tax advantages in mind. If the trust had substance and there was an actual sale of stock to it, § 453 gives Taxpayer the option of using the installment method. He was under no legal or moral obligation to design his security transactions in such a way as to maximize his tax obligations. As the court stated in *Rushing*, "[A] taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insis-

tence and was designed for the purpose of minimizing his tax." 441 F.2d at 598.

Judgment affirmed.