**Billy H. ASHBURN and Faye F. Ashburn, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. CV 81–L–5364–NE.**

United States District Court,
N.D. Alabama,
Northeastern Division.

June 15, 1983.

---

Norman W. Harris, Jr., Harris, Harris, Shinn & Harris, P.A., Decatur, Ala., for plaintiffs.

Frank W. Donaldson, U.S. Atty., Caryl Privett, Asst. U.S. Atty., Birmingham, Ala., Karl L. Kellar, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OF OPINION IN LIEU OF FORMAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

LYNNE, District Judge.

The matter before the Court is plaintiffs' timely application for allowance of attor-neys' fees and other expenses pursuant to the Equal Access to Justice Act. 28 U.S.C. § 2412(d).

The only issues before the Court were framed by the Government's "Opposition to Application for Fees and Other Expenses". The Government maintains that its position in this litigation was substantially justified within the meaning of 28 U.S.C. section 2412(d)(1)(A). The Government further maintains that section 2412(d) does not provide for the award of fees and expenses incurred in prior administrative proceedings, but only for fees incurred in civil actions before the courts of the United States. Finally, the Government states that the plaintiffs must show that the fees claimed are reasonable.

The Government offered no evidence and that of the taxpayers was directed to establish the services rendered and their value.

There is no dispute regarding the background of the controversy between the Government and the Ashburns. Based on the stipulation, concessions in the parties' memoranda, papers in the Court's file, and the testimony at the motion docket, the court finds the following facts and states its conclusions of law.

In April, 1975, Billy H. Ashburn (Billy) and James C. Ashburn (James), who are brothers, owned respectively approximately 30% and 70% of the outstanding shares of stock of Pin Palace Lanes, Inc. (Pin Palace). Pin Palace, a Subchapter S corporation, was engaged in the ownership and operation of a bowling alley.

The Ashburns determined to sell the business and assets of Pin Palace. To complete the sale, they each made a substantial gift in trust for the benefit of their respective children and each appointed Central Bank of Alabama, N.A., (Central Bank) as trustee. Billy and James then each sold all of his stock in Pin Palace to the trust he had created for a downpayment and notes of the trustee payable over 10 years. The total sales price of the stock of Pin Palace was $870,000.

After Central Bank acquired all of the stock of Pin Palace it caused a new board of directors to be elected. The new board was composed of Mr. Paul E. Hargrove, a vice president and trust officer of Central Bank, Billy, the general manager of Pin Palace, and James.

The board, in a special meeting, determined to liquidate and dissolve Pin Palace. It adopted a plan of liquidation under section 337 of the Internal Revenue Code of 1954 which required that the assets be sold or distributed within the period of one year. Immediately after the adoption of the plan of liquidation, all of the assets of the corporation were distributed proportionately to Central Bank, as trustee of the respective Ashburn trusts, except that inventories of alcoholic beverages and snack foods were sold by Pin Palace prior to the distribution of assets to the trustee.

Central Bank then sold all assets other than the cash which the two Ashburn trusts had received. The sales price for all of the assets sold by the two trusts was $900,000. The assets sold consisted of the .76 acres of land the trusts had acquired by gift, plus approximately 4.13 acres the trusts had acquired in the liquidation of Pin Palace. In addition to the land, the real estate conveyed included a building and land improvements. Further, the trustee sold equipment which had been used in the bowling business.

Pin Palace notified the Internal Revenue Service that two trusts had acquired all of its stock. The Internal Revenue Service wrote Pin Palace that its election to be treated as a small business corporation (Subchapter S) was terminated for its present fiscal year which began September 1, 1974 and ended August 31, 1975.

The Ashburns in their individual income tax returns for 1975 elected to report their gain on the sale of shares of Pin Palace by the installment method of accounting authorized by Code section 453. Consistently with their installment sale election, the Ashburns reported gain and paid tax attributable to the gain on installment payments received in years after 1975 on the return for the year in which the payment was received. Pin Palace filed its final corporate income tax return (Form 1120) for the fiscal year ended August 31, 1975. The return reflected tax liability of $24,909. No section 1245 gain was shown in the final corporate return.

Within the 12-month period following the adoption of the plan of liquidation, the corporation was dissolved in accordance with state law.

The adjusted basis or book value of machinery and equipment at the time of liquidation was $54,832. The fair market value of the equipment became a matter of controversy between the Internal Revenue Service and the Ashburns, the Internal Revenue Service contending the equipment should be valued for substantially more than book value and the Ashburns contending the equipment should be valued at book value.

In 1977 the Internal Revenue Service examined the Ashburns' 1975 income tax returns and the return of Pin Palace for its final year. As a result of its examination, the Internal Revenue Service assumed alternative inconsistent positions against the Ashburns and Pin Palace.

The first alternative position was the basis of the action for refund filed by Billy. In it the Internal Revenue Service disregarded the sale of stock to the trusts. Consequently, it determined that the Subchapter S election of Pin Palace had not terminated, that the Ashburns individually were required to include in their returns the corporate income from operations and from section 1245 gain, attributable to the Government's position that the fair market value of assets distributed exceeded the book value of such assets and, finally, that all of the gain on the exchange of the stock for the corporate assets resulting from liquidation was realized in the year of liquidation. The Internal Revenue Service assessed deficiencies against Billy of $77,490.88 and against James of $252,223.43.

Its second alternative position was to treat the transfer to the trusts as valid.

As a consequence, it determined the Subchapter S status of the corporation was terminated and the sales of stock qualified for installment sale reporting. However, under this alternative, it determined a deficiency in the income tax of Pin Palace attributable to section 1245 gain. Consequently, it issued notices of liability as transferee to Central Bank as trustee of the respective trusts, each in the amount of $136,880.54 as a result of such depreciation recapture.

Its third alternative position was to honor the sale to the trusts. As a consequence, the status of Subchapter S was treated as terminated and the sales of stock qualified for installment sale reporting. However, under this position, Billy and James were treated as transferees of the liquidated corporation and notices of liability as transferees were issued to Billy and James individually, each in the amount of $136,880.54 for the same reason.

Consistent with its first determination or primary position the Internal Revenue Service determined an overassessment of the tax paid by Pin Palace with its final return. It also determined overpayments by Billy and James for the years 1976 and 1977 attributable to the gain they reported on installments received from the trust in those years.

Negotiations by the attorneys for the Ashburns with the Internal Revenue Service resulted in a plan to resolve the controversy growing out of the position taken by the Ashburns and the positions taken by the Internal Revenue Service. The plan agreed upon was that Billy would pay the assessment against him in the amount of $77,490.88, file a claim for refund, and upon its denial bring suit for a refund. The parties further agreed that the entire controversy between the Ashburns and the United States would be disposed of in accordance with the judgment to be entered in Billy's suit for refund, and if he was successful in that suit all of the assessments were to be abated.

Billy and James filed protective claims for refund for years subsequent to 1975. These claims excluded gain from the sale of Pin Palace stock which gain the Internal Revenue Service had included in full for 1975. All of the claims were denied except for one of Billy's which was paid by mistake.

Accordingly, Billy paid tax, penalty, and interest of $106,604.62 assessed against him in a notice of deficiency.

The adjustments to Billy's income for 1975 which produced the deficiency of $77,490.88, which together with interest and penalty raised the total to the amount paid, were attributable to the denial of the use of installment sale method of reporting gain, inclusion of a proportionate part of Pin Palace's income and section 1245 gain, and reduction for a proportionate part of dividends paid by Pin Palace during its final fiscal year which ended August 31, 1975.

Billy filed a timely claim for refund for 1975 and after the lapse of six months without action on the part of the United States filed suit on November 3, 1981 for refund for the entire amount paid. The complaint had attached to it as an exhibit the claim for refund; this claim made clear the facts underlying the controversy between the Government and the taxpayers and the legal questions involved.

The United States served its answer to the complaint on December 29, 1981. In its answer it denied that the tax, penalty, and interest was illegally assessed or collected and it denied that plaintiffs were entitled to a refund. The Internal Revenue Service did not send relevant administrative files to the Justice Department until April 29, 1982.

On September 29, 1982, nine months after its answer and shortly before a scheduled pretrial conference, Government counsel informed this Court that the Government's case would likely be conceded and that there was no need for pretrial conference. Counsel for the Government then sought approval of the proposed concession

by the Internal Revenue Service and the Review Section of the Department of Justice. The Justice Department notified plaintiff's counsel of its approval forty days later on November 9, 1982.

Judgment was entered March 22, 1983 in favor of the plaintiffs and against the defendant for the full amount sought reduced by a prior administrative refund made on one of the protective claims for refund.

It has been stipulated that plaintiffs had a net worth of less than $1,000,000 and it is obvious that Billy Ashburn was the prevailing party.

The plaintiffs' application for fees and other expenses claimed $23,330.17, fees and expenses for their attorneys, together with cost of the civil action. The amount sought was computed at $75.00 per hour for time expended and $372.67 for expenses. Mr. Harris and Mr. Perry, in addition to the hours submitted with the application for fees and other expenses, each expended 12 hours in connection with preparation of a memorandum of law and in preparation for and attendance at the motion docket at which this matter was heard.

A reasonable fee for the services rendered in connection with the representation of the Ashburns is $30,000.00 based on a reasonable hourly rate in the community for such work of $100.00 per hour. The plaintiffs' application claims only the statutory rate.

The court finds that it is reasonable to estimate, as plaintiffs' attorney testified, that 25% of the services rendered was allocable to the James C. Ashburn controversy and 75% to the Billy H. Ashburn controversy. However, the court further finds that the claims of the Government against the two Ashburns were so interrelated and inextricably connected that the controversy was unitary and all of the attorneys' services were reasonably necessary for the proper handling of either; in other words, the services in the James C. Ashburn controversy overlapped and supported the suc-

cessful prosecution of the Billy Ashburn claim.

■ The services rendered by plaintiffs' attorney prior to the commencement of suit were appropriate and helpful as those services allowed plaintiffs' counsel to learn the Government's position, the basis of the Government's case, the evidence that the Government would probably offer, the method used by the Government in reaching its determination of the value of assets, and the probable response to the plaintiffs' evidence. The services rendered were required to enable the plaintiffs to prepare for the civil action and in effect served the same purpose as discovery would have after the commencement of suit.

All of the services rendered by plaintiffs' attorneys and claimed in the application were necessary and appropriate to the resistance and defense against the unjustifiable claim and position of the Government.

From the foregoing facts and for the reasons hereinafter stated, the court finds that the position of the United States was not substantially justified either in the proceedings before the Internal Revenue Service or in the civil action in this court brought by plaintiffs to recover the tax, penalty, and interest which the Government finally conceded in full, nor are there any circumstances which make an award of fees and expenses unjust.

28 U.S.C. Section 2412(d)(1)(A) which was enacted as part of the Equal Access to Justice Act, (P.L. 96–481, Title II, 94 Stat. 2325 (1980)) (EAJA) provides as follows:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any cost awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United

States was substantially justified or that special circumstances make an award unjust.

Section 2412(d)(2)(C) defines "United States" as including "any agency and any official of the United States acting in his or her official capacity."

House Rep. No. 96–1418, 96th Cong.2d Sess. 1980 at page 5, U.S.Code Cong. & Admin.News, pp. 4953, 4984, shows the Congressional concern and is as follows:

That certain individuals, partnerships, corporations and labor and other organizations may be deterred from seeking review of, or defending against unreasonable governmental action because of the expense involved in securing the vindication of their rights. The economic deterrents to contesting governmental action are magnified in these cases by the disparity between the resources and expertise of these individuals and their government. The purpose of the bill is to reduce the deterrents and disparity by entitling certain prevailing parties to recover an award of attorney's fees, expert witness fees and other expenses against the United States, unless the government actually was substantially justified. H.R.Report No. 96–1418, 96th Cong.2d Sess. 1980, at page 5, U.S.Code Cong. & Admin.News, p. 4984.

The same report further indicating the congressional concern and the problems sought to be alleviated by the Equal Access to Justice Act states at page 10, U.S.Code Cong. & Admin.News, p. 4988:

While the influence of the bureaucracy over all aspects of life has increased, the ability of most citizens to contest any unreasonable exercise of authority has decreased. Thus, at the present time, the government with its greater resources and expertise can in effect coerce compliance with its position. Where compliance is coerced, precedent may be established on the basis of an uncontested order rather than the thoughtful presentation and considera-

tion of opposing views. In fact, there is evidence that small businesses are the target of agency action precisely because they do not have the resources to fully litigate the issue. This kind of truncated justice undermines the integrity of the decision making process.

The Government's argument in opposition to the award of attorneys' fees and costs is that its position in this case was substantially justified because the statute is clearly referring to the position taken during the litigation in court and the Government conceded this case as soon as it was presented for pretrial conference. The Government has also argued that the position taken by the Internal Revenue Service was substantially justified because the facts present in this case were distinguishable from the fact pattern previously litigated and lost by the Government in *Rushing v. United States*, 441 F.2d 593 (5th Cir.1971) aff'g 52 T.C. 888 (1969) and a number of subsequent cases.

It is the taxpayers' argument that the "position of the United States" which must be substantially justified is both its litigation position and its position which made it necessary to file the action. It is also taxpayers' argument that the facts of this case are not materially different from *Rushing* and related cases, that any further litigation in this area was not reasonable, and that therefore at no time in this controversy was the position of the Government substantially justified.

■ It is the court's opinion that the statutory language "position of the United States" requires an examination of the underlying conduct of the agency, here the Internal Revenue Service, and not merely the trial conduct.

In *Natural Resources Defense Counsel, Inc. v. Environmental Protection Agency*, 703 F.2d 700 (3d Cir.1983) the court addressed the Government's "position" argument noting that two courts of appeal seem to have adopted the view that the "position

of the United States" refers to the "position of the United States taken in litigation before the courts", rather than the "position taken by an agency of the United States which made it necessary to file the action" citing *Broad Avenue Laundry & Tailoring v. United States*, 693 F.2d 1387 (Fed.Cir.1982) and *Tyler Business Services, Inc. v. NLRB*, 695 F.2d 73 (4th Cir.1982). The court, at pages 706–707, disagreed with this interpretation and stated that:

> The interpretation adopted by the dissent and the *Broad Avenue, Tyler* and *Riggers* courts means that no matter how outrageously improper the agency action has been, and no matter how intransigently a wrong position has been maintained prior to the litigation, and no matter how often the same agency repeats the offending conduct, the statute has no application, so long as employees of the Justice Department act reasonably when they appear before the court. Such an interpretation ignores a term in the statute:
>
> > (C) "United States" includes any agency and any official of the United States acting in his or her official capacity."
>
> \* \* \* \* ⸙ \*
>
> The statute's legislative history establishes beyond question that Congress intended that the statute provide an incentive for suits to control agency actions, not merely to make Justice Department litigators behave.

In order for the EAJA to have significant effect the underlying conduct of the agency and its trial conduct must be considered. This interpretation is the more reasonable one and other decisions agree. See, e.g. *Photo Data, Inc. v. Sawyer*, 533 F.Supp. 348 (D.C.D.C.1982); *Moholland v. Schweiker*, 546 F.Supp. 383 (D.C.N.H.1982); *Wolverton v. Schweiker*, 533 F.Supp. 420 (D.C. Idaho 1982); *Fitzgerald v. Hampton*, 545 F.Supp. 53 (D.D.C.1982); *Cornella v. Schweiker*, 553 F.Supp. 240 (D.C.S.D.1982);

*Constantino v. United States*, 536 F.Supp. 60 (E.D.Pa.1981); *McDonald v. Schweiker*, 553 F.Supp. 536 (E.D.N.Y.1982); *Environmental Defense Fund, Inc. v. Watt*, 554 F.Supp. 36 (E.D.N.Y.1982). Some decisions have reached a contrary result, that is, *Broad Avenue Laundry and Tailoring v. United States*, supra; *Tyler Business Services v. NLRB*, supra; *Alspach v. District Director of Internal Revenue*, 527 F.Supp. 225 (D.C.Md.1981); *Berman v. Schweiker*, 531 F.Supp. 1149 (N.D.Ill.1982); *Operating Engineers Local U. No. 3 v. Bohn*, 541 F.Supp. 486 (D.Utah 1982).

*S & H Riggers & Erectors, Inc. v. OSHRC*, 672 F.2d 426 (5th Cir.1982), relied on by the Government as examining only the in court litigating position decided two questions. The first question was whether the adversary adjudication before the Occupational Safety and Health Review Commission was pending on the effective date of the Act. The court determined that an appeal is not a continuation of the proceedings at the agency level and therefore the proceedings were before the effective date of the act. The second issue decided by Judge Godbold was that the position of the Government was substantially justified. The later case of *Knights of the K.K.K. v. East Baton Rouge*, 679 F.2d 64 (5th Cir. 1982) notes that *S & H Riggers & Erectors* did not decide anything which supports the Government's contention that it is only the "litigation position" with which the court is concerned. The opinion states, at page 68, that:

> Neither the Act nor the legislative history provides a conclusive answer as to whether the "position" for which substantial justification must be shown is the United States litigation position or the United States posture in its pre-trial actions.

▆ The position of the Government after the refund suit was filed has not been shown to be substantially justified. The clearest statement of the Government's position is contained in General Counsel Mem-

orandum 38956, January 5, 1983, which shows that the Government's litigating position in *Rushing* type transactions remained unaltered until an August 20, 1982 memorandum of the Tax Litigating Division of the Internal Revenue Service recommended a change of position which had been maintained during the thirteen years since *Rushing* had been decided. Thus, the position of the Government did not change until some ten months after suit was commenced and as a result the in court litigating position has not been shown to be substantially justified. In addition the Government has made no effort at all to justify its position on the valuation of the business equipment on which it proposed a substantial deficiency. It simply abandoned this issue.

The position which the Government took in asserting the claims against the Ashburns was clearly contrary to the decision in *Rushing v. Commissioner*, 441 F.2d 593 (5th Cir.1971) aff'g 52 T.C. 888 (1969) and there was no substantial difference between the issue decided in *Rushing* and that between the Ashburns and the Government. In addition, the Government had taken the same position in a number of cases subsequent to *Rushing* and was singularly unsuccessful in convincing any court that its position should be adopted in cases involving installment sales of corporate assets. These cases include, *Weaver v. Commissioner*, 647 F.2d 690 (6th Cir. 1981) *aff'g per curiam* 71 T.C. 443 (1978); *Roberts v. Commissioner*, 643 F.2d 654 (9th Cir.1981) *aff'g* 71 T.C. 311 (1978); *Pityo v. Commissioner*, 70 T.C. 225 (1978); *Davidson v. Commissioner*, 42 CCH TCM 903 (1981).

■ The Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), (which precedent has been adopted in the Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981)) enumerated a number of factors to be considered in the award of attorneys' fees. The Government complains of the number of hours expended by the plaintiffs' attorneys, the time expended in arranging a bond to forestall collection and other matters. Considering only the factors which are material to this case particularly the court's experience in judging the hours claimed for the work produced, the length of the dispute, its complexity, the result obtained, the substantial dollar amount involved, the ability of the attorneys, and the fact that the case was developed prior to institution of suit convinces the court that the application for allowance of fees is entirely reasonable and properly allowable. To award less would thwart the basic purpose of the EAJA to equalize private litigants with the Government. *The Citizens Bank, Valley Head, Alabama v. United States*, 558 F.Supp. 1301 (N.D.Ala. 1983).

For the foregoing reasons the plaintiffs' application for fees and expenses and cost is granted. Pursuant to the foregoing opinion judgment herein will be set forth on a separate document as required by Rule 58 FRCP.

## ORDER

IT IS SO ORDERED, this 14 day of June, 1983.