**Harold ROTHSTEIN and David M. Rothstein as Executors of the Estate of Alexander Rothstein, Deceased, and Reba Rothstein, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 519, Docket 83–6198.**

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1983.

Decided May 21, 1984.

Ira B. Grudberg, New Haven, Conn. (Jonathan Katz, Charles B. Price, Jr., and Jacobs, Grudberg & Belt, P.C., New Haven, Conn.), for plaintiffs-appellants.

Thomas M. Preston, Atty. Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, William S. Estabrook, Attys., Tax Div., Dept. of Justice, Washington, D.C., and Alan H. Nevas, U.S. Atty., New Haven, Conn.), for defendant-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

Harold and David M. Rothstein, as executors of the estate of Alexander Rothstein, and Reba Rothstein, his widow, appeal from a judgment of the District Court for Connecticut, which dismissed their action for a tax refund after trial before Judge Eginton and an advisory jury, 574 F.Supp. 19. Appellants urge two grounds for reversal. One involves the interpretation of §§ 453, 671 and 675 of the Internal Revenue Code ("IRC"); the other relates to the judge's having *sua sponte* stricken from the jury panel eleven veniremen solely because they had some experience with rental property or connection with closely held corporations. In the view we take of the case only the first requires statement and discussion.

The district court found the facts to be as follows: In 1951 decedent Alexander Rothstein ("taxpayer") and Abraham Savin formed a real estate holding company known as Industrial Developers, Inc. ("IDI"). They purchased, at a cost of $30,000 each, a parcel of land in East Hartford, Connecticut, which they conveyed to the corporation, each receiving 300 shares of IDI stock. The corporation constructed, at a cost not disclosed in the record, warehouses which were used as rental property.

On February 18, 1957, taxpayer contributed his 300 shares of IDI to an irrevocable trust he established for the benefit of his three children, Harold, David and Edna. Taxpayer's wife Reba was the trustee. Although the trust was required to distribute any dividends received on the IDI stock, which was its sole asset, to the beneficiaries at least semi-annually, no dividends were ever paid.

In October 1964, taxpayer bought Savin's 300 shares of IDI for $500,000, agreeing to pay the purchase price at a later date. On November 13, 1964, he purchased from his wife as trustee the trust's 300 shares for $320,000. Payment was made by an unsecured promissory note bearing an interest rate of 5% per annum, payable semi-annually beginning May 13, 1965. These payments were duly made. Principal payments were scheduled to be made as follows: $25,000 on or before November 13, 1969; $25,000 on or before November 13, 1970; $50,000 on or before November 13, 1971; and $50,000 on or before November 13 of each calendar year thereafter until the full sum of $320,000 had been paid.

In January 1965, taxpayer, having become owner of all of IDI's stock as a result of the transactions with Savin and the trust, dissolved IDI and had all its assets transferred to himself. He then refinanced the property, replacing an existing mortgage of less than $200,000 with a new $700,000 mortgage to Equitable Life Insurance Company and using the approximately $500,000 excess of the new mortgage over the old to discharge his debt to Savin. On February 8, 1965, he gave a second mortgage of $320,000 to his wife as trustee to secure the promissory note of that amount given in exchange for the trust's IDI shares three months before.

In their joint federal income tax return for 1965 taxpayer and his wife claimed deductions for (1) $16,000 in interest paid to the trust on the promissory note, and (2) a short-term capital loss of $33,171 on the liquidation of IDI, determined as follows:

| | | |
|---|---|---|
| fair market value of property received upon liquidation | | $1,054,580 |
| Less: | | |
| IDI liabilities assumed | $267,751 | |
| Cost of stock acquired from Savin | 500,000 | |
| Cost of stock acquired from trust | 320,000 | |
| | | $1,087,751 |
| Gain (loss) realized | | ($33,171) |

706

The Commissioner, however, asserted a deficiency of $56,664 based on his disallowance of the interest deduction and his determination that taxpayer had in fact realized a substantial gain on the liquidation of IDI. As now presented by the Government, the Commissioner's theory was that, under IRC § 675(3) [1], the taxpayer was to be treated as the "owner" of the trust assets and that this crucially affected the tax consequences of the events described above. On this view, transactions involving trust assets were to be re-analyzed after substituting the taxpayer (as the "owner" of those assets) for the trust. Thus, the Commissioner disallowed the $16,000 interest deduction, since the taxpayer was not entitled to a deduction for amounts paid to himself as "owner" of the promissory note held by the trust. Similarly, in computing taxpayer's gain on the liquidation of IDI, the Commissioner reduced taxpayer's basis in the shares acquired from the trust from $320,000 to $30,000. His rationale, apparently, was that the taxpayer could not claim a full "cost" basis in stock acquired in a sale that involved nothing more than a transfer of the property from the taxpayer (as "owner" of the stock) to himself.[2]

In July 1967, taxpayer paid the asserted deficiency, together with interest of $2,470. In February 1969 Mr. and Mrs. Rothstein filed a claim for a refund in the amount of $57,942.12. After this was denied, the Rothsteins filed a protest, which the IRS held for more than five years, during which time Alexander Rothstein died. The protest was finally disallowed and Rothstein's executors and widow brought this refund suit against the United States under 28 U.S.C. § 1346(a)(1).

Although both sides were entitled to a jury trial, 28 U.S.C. § 2402, the case was tried by the judge with an advisory jury. After denying motions by both sides for a directed verdict, the judge put four interrogatories to the jury. The questions and answers were as follows:

1. Was the sale by the Trustee, Reba Rothstein, to the grantor, Alexander Rothstein of 300 shares of IDI stock for $320,000 for adequate consideration?
Yes.

2. Was the trustee, Reba Rothstein, subservient to the grantor, Alexander Rothstein, when she accepted a note from Alexander Rothstein in the amount of $320,000 in exchange for the 300 shares of IDI stock from the trust?
Yes.

3. Was adequate security provided by Alexander Rothstein for the $320,000 note given by him in November, 1964 to Reba Rothstein as trustee?
No.

4. Did the note for $320,000 from Alexander Rothstein to Reba Rothstein, as trustee for the children, provide for an adequate rate of interest?
Yes.

---

1. This provides:
   § 675. Administrative powers
   The grantor shall be treated as the owner of any portion of a trust in respect of which—
   (3) Borrowing of the trust funds
   The grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year. The preceding sentence shall not apply to a loan which provides for adequate interest and adequate security, if such loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.

2. The $30,000 basis asserted by the Commissioner seems to reflect either a carry-over of the trust's basis in the shares or perhaps, as suggest-

ed in the Government's brief, taxpayer's original basis in the shares that he transferred to the trust—the two being here identical by virtue of IRC § 1015(a). Using this reduced figure as taxpayer's basis and an appraisal that the property received was worth $950,000, the Commissioner determined that the taxpayer had realized a capital gain of approximately $152,000 on the liquidation of IDI. The Commissioner's gross adjustment—some $184,000—represents the recomputed gain plus the allegedly erroneously computed loss that appeared on taxpayer's return. After the 50% allowable deduction, this yielded a net increase in taxable income of approximately $92,000, to which was added $16,000 representing the disallowance of the deduction for interest paid to the trust. The resultant deficiency was $56,664, plus interest.

The judge then made findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a). He ruled that the 1964 sale of the IDI stock involved a borrowing of trust funds under the first sentence of IRC § 675(3) and, in accordance with the advisory jury's answers with respect to lack of adequate security and subservience, that it did not fall within the exception created by the second sentence. Without further discussion, the judge entered judgment for the Government, presumably because he agreed with the Commissioner that, if § 675(3) applied, this would entail disallowance of taxpayer's interest deduction and reduction of his basis in the shares of IDI acquired from the trust.

## DISCUSSION

Taxpayer's principal argument on the merits is that his purchase, on credit, of the 300 shares of IDI did not involve a "borrowing" from the trust and therefore did not come within IRC § 675(3), which applies only when the grantor "has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including any interest, before the beginning of the taxable year". The image most immediately conveyed by the statutory language is that of a grantor who has obtained an asset from the trust, whether money or otherwise, in exchange for a promise to return the same asset at some future time. Taxpayer is correct in noting that a transaction like that here in question—a sale of a trust asset on credit—involves no borrowing of the asset sold. However, the Commissioner's argument is that what was "directly or indirectly borrowed" was not the IDI stock but money in the amount of the purchase price. On the Commissioner's view, the trust's extension of credit was a "loan" within the meaning of § 675(3), notwithstanding that the loan

"proceeds" were immediately used to pay for the shares.

Whether an extension of credit in a sale should be deemed a "loan" for purposes of § 675(3) is not easily answered on the basis of the language of the statute alone. On the one hand, Black's Law Dictionary 844 (5th ed. 1979) defines "loan" quite narrowly as the "[d]elivery by one party to and receipt by another party of [a] sum of money upon agreement, express or implied, to repay it with or without interest". This definition suggests that an extension of credit is not a loan unless there is actual delivery of loan proceeds to the obligor. A similar distinction appears to underlie the numerous decisions holding that, for purposes of a usury statute, a sale on credit is not a loan. *See, e.g., Bartholomew v. Northampton Nat'l Bank,* 584 F.2d 1288, 1295 (3 Cir.1978) (Pennsylvania law). On the other hand, it is common enough to conceive of a credit sale as involving a loan, as witness the many statutes referred to as "truth-in-lending" laws, *see, e.g.,* Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.* ("Truth in Lending Act"), although one hardly says that the purchaser has borrowed the property purchased.[3]

More important in deciding whether § 675(3) should apply in the instant case is the object which the statute was intended to serve. As is well known, the purpose of IRC §§ 671–79 and the regulations that preceded them was to bring order out of the chaos that has been created by the decision in *Helvering v. Clifford,* 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940), that a grantor's continued domination of a trust might render trust income taxable to him. This led to over a hundred decisions in the courts of appeals, some holding *Clifford* to be applicable and others holding the contrary, with little difference in the facts, see 1 Surrey & Warren, Federal Income Taxa-

---

**3.** It could be further contended on behalf of the taxpayer that Congress dealt with the subject of purchases from a trust in § 675(1) (regarding certain powers "to purchase, exchange, or otherwise deal with or dispose of the corpus or the income therefrom for less than an adequate consideration"), thus arguing for a narrower

interpretation of § 675(3). Against this is the fact that § 675(1) applies only to powers permitting purchases for inadequate consideration, whereas § 675(3) applies, irrespective of a previously existing power, where the loan is either inadequately secured or made by "a related or subordinate trustee subservient to the grantor".

# 708

tion 1340 (1972 ed.). The purpose of the regulations, originally issued in 1945, amended in 1947, and codified in 1954, was "to establish a definite line separating 'Clifford trusts' where income is taxable to the grantor from trusts falling under the general trust sections [where income is taxable to the trust or its distributees]." *Id.* at 1341. The statute directs that the grantor shall be treated as "owner" of a portion of a trust not only when a reversionary interest "will or may reasonably be expected to take effect in possession or enjoyment within 10 years commencing with the date of the transfer of that portion of the trust," § 673(a), but in many other instances where, although the trust was expected to have a longer duration, the grantor's powers or acts were thought by the Commissioner and later by Congress to indicate that he remained in effective control.

Section 675, entitled "Administrative powers", is a subset of the many provisions dealing with the retention of substantial interests in and powers over a trust. Broadly speaking, it requires that the grantor be treated as "owner" of a trust when he could engage or has engaged in certain transactions with the trust without providing adequate consideration. In particular, § 675(3) addresses those situations in which the grantor has exercised "dominion and control" over a trust by borrowing from it at less than an adequate rate of interest or without giving adequate security for his promise to repay the loan. Indeed, § 675(3)'s determination to prevent a grantor's treating a trust as his private bank without paying the tax consequences is so strong that the grantor is to be treated as "owner" even if the rate of interest and the security *are* adequate, unless the loan is made by a trustee other than the

grantor or "a related or subordinate trustee subservient to the grantor".

There can be no doubt that the extension of credit in the present case, made without adequate security by a subservient trustee, would fall within the scope of the statute should we deem it a "borrowing" or "loan" under § 675(3). We think it is consistent with the overall purpose of Congress to do so. *First*, in view of the fact that the statute is to apply to any grantor who has "borrowed" from the trust, whether "directly *or indirectly*" (emphasis supplied), we cannot attach much weight to the distinction, mentioned above, between (1) an extension of credit in which the proceeds are actually delivered to and received by the obligor, and (2) one in which they are immediately applied to the purchase of an asset from the obligee. *Second*, we must consider the consequences of a decision that an extension of credit like this is *not* within the scope § 675(3). A grantor wishing to obtain a loan from a trust while steering clear of the statute could always do so by arranging for the trust to purchase, for example, marketable securities with a value equal to the amount of the contemplated loan, which the grantor would then purchase from the trust in exchange for his note. The grantor could then sell the securities on the market, leaving him with cash and the trust with his note—just as if it had made him a conventional loan. The only difference would be that § 675(3) would not apply, since the extension of credit in the sale did not involve actual delivery of loan proceeds to the grantor. Accepting taxpayer's argument would in effect largely annul § 675(3). We therefore adopt the district court's conclusion that the extension of credit here was, at least "indirectly", a "borrowing" within the meaning of the statute.[3a]

**3a.** Our ruling does not rest on any conclusion that the transaction here in question was a "sham", as Chief Judge Feinberg seems to suggest. We do not question the authenticity of the sale by the trust but adhere to the not very novel proposition that the trust's extension of credit to enable Rothstein to finance the sale was a "borrowing" for purposes of § 675(3).

We also note that the hypothetical in the text, which Chief Judge Feinberg would dispose of as a "sham", describes only the most egregious case. One can readily imagine situations in which the asset in question would be one already held by the trust or something other than a marketable security, but would nonetheless be an item of value for which the grantor would

While we thus agree with the Government that the taxpayer's purchase of the IDI stock in exchange for his installment note involved a "loan" under § 675(3), we disagree with its contention that this requires a complete recharacterization for tax purposes of transactions involving the taxpayer and the trust. If § 675(3) stood alone, we might agree that taxpayer's "ownership" of trust assets should prevent his claiming a deduction for interest paid on the note or a full cost basis in the shares acquired from the trust. However, § 675 is only one of a battery of provisions, see §§ 673–74, 676–79, requiring that the grantor or another person be treated as the "owner" of trust assets. All of these provisions are subject to § 671, in which Congress expressly stated the consequences of such "ownership":

> Where it is specified in this subpart [§§ 671–79] that the grantor . . . shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor . . . those items of income, deductions, and credits against tax which are attributable to that portion of the trust to the extent such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. Any remaining portion of the trust shall be subject to subparts A through D [§§ 641–68].

Section 671 makes it plain that it was not Congress's intention that the taxation of grantor/"owners" be governed by what might otherwise seem the sensible general principle that a taxpayer may not have meaningful dealings with himself.[4] Rather, the statute envisions (1) that the income and deductions of the grantor and the trust will be computed in the normal fashion, the trust being treated as a fully independent tax-paying entity, and (2) that the relevant "items of income, deductions, and credits against tax" that would ordinarily appear on the trust's return will instead "be included in computing the taxable income and credits of the grantor". Nowhere does § 671 direct that the grantor's basis in property purchased from the trust be deemed any different from what it would otherwise be, namely, his cost in acquiring it—in this case $320,000, the amount of taxpayer's note. Nor does the statute contain anything authorizing the Commissioner to disallow an interest deduction on the ground that grantor's payments were made to the trust. Consistently with the objective of *Clifford* to prevent high-bracket taxpayers from shifting income to low-bracket trusts over which they retain or exercise excessive controls, § 671 dictates that, when the grantor is regarded as "owner", the trust's income shall be attributed to him—this and nothing more.

In some instances the result of applying § 671 as written will be identical with what would have obtained under the Government's approach of recharacterizing the transaction. Here, for example, application of § 671 would mean that the trust's $16,000 annual interest income on the promissory note would be included in computing *taxpayer's* gross income, but would be offset by an equivalent deduction for the interest paid—with the same net result as under the Government's approach, where the taxpayer would be neither entitled to the deduction nor required to treat as income the payments received. But in other instances, the two approaches can yield quite different results. Here, for example, if the full amount of the note had been paid in 1965, the trust would have realized a gain in the amount of $290,000 (the excess of $320,000 over the trust's $30,000 carryover basis in the shares transferred to it in 1957, see § 1015(a)). Under § 671 this gain

gladly give his unsecured note. It is unclear how such cases would be dealt with under Chief Judge Feinberg's proposal, notwithstanding that they are as much the target of § 675(3) as the example in the text.

**4.** It should be observed that most of the provisions of §§ 673–79 mandate "ownership" treat-

ment in circumstances in which there may have been no transaction between the grantor and the trust. In those instances, § 671 *must* operate by imputing tax items to the grantor, not by recharacterizing his dealings with the trust.

would be includible in the taxpayer's income, whereas under the Government's approach, which would "disregard" the sale for tax purposes, no one would realize taxable income unless and until the taxpayer sold the stock.

The Government's grievance apparently derives from the fact that, here, in contrast to the hypothetical where the precise application of § 671 would work to its advantage in the year 1965, neither the taxpayer nor the trust had reported a capital gain on the sale of the IDI shares in 1964.[5] This, however, is simply a consequence of the provisions of § 453, governing installment sales. We disagree with the district court's contention that § 453 supplies little aid to the taxpayer here because it was "designed to alleviate a hardship on the *seller* by permitting an installment seller to report a proportionate share of the gain during each year in which he receives proceeds from the sale" (emphasis in original). Under § 671 the income of the seller (the trust) is to be computed as in the case of an individual, and as the Government concedes in its brief "the transaction under consideration in this case may properly be characterized as an installment sale, and ... the *seller*, here the trust, may elect to recognize its income proportionately over the period of the payment schedule" (emphasis in original). It is that income, if any there be in the taxable year, which § 671 directs shall be imputed to the grantor in cases where, under other sections, he is to be treated as owner of a portion of the trust. Because the trust had no reportable gain in 1965, application of § 675(3) to the taxpayer should not increase his tax liability on account of the trust's sale of IDI stock. The reason why taxpayer realized no gain in the liquidation of IDI is not, as the dissent argues, that we are allowing him "to take advantage of the trust's prior election to receive a portion of its proceeds from the taxpayer/grantor on an install-

ment basis", but that the taxpayer obtained a new basis of $320,000 as a consequence of his purchase from the trust and that this resulted in his realizing a loss on his subsequent disposition of the IDI shares. Nothing in § 671 says that a grantor shall not be entitled to his usual cost basis in property purchased from a trust of which other sections direct he shall be treated as "owner"; it says only, so far as here relevant, that if his purchase results in taxable gain to the trust, he is taxable on the gain. But here the trust, having properly taken advantage of the opportunity to account for its gain on the installment basis, had no reportable income on the sale to the taxpayer that could be imputed to him under § 671. The dissent simply refuses to recognize that the consequences of violating § 675(3) are those and only those specified in § 671. It is immaterial whether the statutory scheme envisioned by Judge Oakes would achieve better results; we are governed by the statute as it is. Congress specified the consequences of violating § 675(3) and similar provisions in § 671; we are not at liberty to enlarge upon it.

The judgment dismissing taxpayer's claim is reversed and the cause remanded to the district court for the entry of a judgment in favor of the taxpayer consistent with this opinion.

FEINBERG, Chief Judge (concurring and dissenting):

I feel compelled to write a separate opinion because my view of the transaction in question is entirely different from that of my colleagues. In my judgment, the crucial issue is whether IRC § 675(3) applies at all to the trust's installment sale of stock to Rothstein. This issue turns on whether that transaction is a "borrowing" within the meaning of § 675(3) or a sale. Although they disagree on the consequences flowing therefrom, both Judges Friendly and Oakes agree that § 675(3) applies be-

---

**5.** The record does not show whether the trust paid capital gains tax beginning in 1969 when principal payments became taxable under the installment sale provision, IRC § 453(b). Neither the taxpayer's nor the Government's coun-

sel was able to respond to our inquiries at argument on this score. The Government's brief tells us only that "[t]he Government has not made any assertions whatever regarding the realization of gain by the seller in this case."

cause they apparently view the installment sale as either a "borrowing" of the purchase price of the stock or an extension of credit equal to the purchase price. I disagree.

The transaction was not a sham sale. There was a mutual exchange of consideration that made both parties better off and that had genuine economic substance. For over seven years prior to the sale, the trust's asset was stock in a closely held corporation, which had paid no dividends to stockholders and for which there was apparently no market. After the sale, the trust held an asset, Rothstein's promissory note, that paid interest and that conceivably could be discounted for cash. It is significant that the advisory jury and the district judge found that the $320,000 installment note was adequate consideration for the stock. For his part, Rothstein received full title to the stock to do with whatever he pleased (which, incidently, is the reason no one is arguing the stock was borrowed). This, and the coordinate purchase of Savin's stock, enabled Rothstein to liquidate the company, reorganize and refinance it and continue the enterprise, another factor suggesting economic substance to the transaction rather than an attempt to evade the Clifford regulations. The government makes much of the fact that Rothstein did not give security for the promissory note until after the end of the taxable year. Yet Savin gave full title to his stock to Rothstein in October 1964, but was not paid until after Rothstein liquidated the company and took out a mortgage on its former assets in January 1965. Surely, that was not a loan of Savin's stock, nor do I view it as a loan of the purchase price, but simply a deferred payment date. Whatever risk Savin incurred by accepting a deferred payment date without interim security was apparently offset in his view by the economic gain to him from the deal. The same is true for the trust.

In this case, the Commissioner seeks to recharacterize the transaction because he apparently does not like the favorable tax consequences for Rothstein. In a case analogous to this one and also involving the Clifford Regulations, the Ninth Circuit was presented with a sale of stock and other property to a grantor trust in return for a lifetime annuity. It refused to recharacterize the transaction as a reservation of a life estate, which would have caused the trust income to be taxable to the grantor under IRC §§ 677(a) and 671. *Lafargue v. C.I.R.*, 689 F.2d 845 (9th Cir.1982). The court found that the sale had genuine substance and was not a disguised conduit for distribution of the trust income. The annuity was fixed and was not an attempt to approximate the income production of the trust assets. The taxpayer-annuitant bore the risk of early death or appreciation of the trust assets; the trust bore the risk of late demise or depreciation of the trust assets. The court concluded that "[i]n these circumstances, Taxpayer's formal characterization of the transaction as a sale in exchange for an annuity should not be disregarded for tax purposes." Id. at 850. Similarly, because of the economic substance behind the transaction at bar, I do not believe it should be recharacterized as a "borrowing" within § 675(3).

The sham sale analysis that I would apply in determining the applicability of § 675(3) does not produce the undesirable consequences suggested by Judge Friendly's hypothetical case in which "[a] grantor wishing to obtain a loan from a trust while steering clear of the statute could always do so by arranging for the trust to purchase, for example, marketable securities with a value equal to the amount of the contemplated loan, which the grantor would then purchase from the trust in exchange for his note." Supra at 708. The hypothesized transaction would be patently a sham. There would be no reason for the trust to engage in such a transaction. Why would the trust give up freely marketable securities it had just purchased for a promissory note? Alternatively, if a promissory note was attractive to the trust for some reason, why wouldn't it simply give cash for the promissory note? Because of the lack of economic substance, the govern-

ment would be permitted to recharacterize the two steps of the hypothetical transaction as a loan of money with which the taxpayer happened to purchase marketable securities.

The real objection that the Commissioner and Judge Oakes appear to have is to the use of the installment sale device between a grantor and a trust to produce favorable tax consequences in addition to accomplishing whatever other economic objectives the parties may have. However, as long as the transaction is not a sham, the choice is one Congress has made. The taxpayer is free to structure his transactions, and specifically may choose to employ the installment sale device, to minimize his tax consequences. See *Roberts v. C.I.R.*, 643 F.2d 654 (9th Cir.1981) (installment sale of stock to grantor trust, which resold stock on open market; grantor's use of § 453 to defer taxation upheld).

Having concluded that § 675(3) does not apply, I have no need to consider the scope of § 671. Under my approach, the appreciation of the stock is taxed to the trust as it receives installment payments. In this respect, my approach produces the same result as Judge Friendly's. However, since § 671 does not come into play at all under my approach, the interest income on the installment note is also taxed to the trust and is not attributed to Rothstein. Hence he would get a corresponding deduction, which probably would not be a wash because his tax rates for the relevant years are likely to be higher than the trust's. For the purpose of the remand, my position in regard to the interest income is a minority one; both Judges Friendly and Oakes would attribute the trust's interest income to Rothstein. However, were I to view the transaction as a borrowing, as do my colleagues, I would agree with Judge Friendly's interpretation of the consequences under § 671.

OAKES, Circuit Judge (dissenting):

Judge Friendly and I agree that under section 675(3), the taxpayer is to be treated as the "owner" of the trust assets because of the "dominion and control" he exercised in borrowing from a trustee who is related and subservient. His opinion also takes the position, with which I am in complete accord, that the trust's carryover basis in the stock was $30,000, i.e., the grantor's basis under section 1015(a) (*see* parenthetical in opinion at 13; see also n. 2). Thereafter, however, we differ. In particular, we do not agree that after application of section 675(3) the grantor's basis in the IDI shares which he had transferred to the trust and "bought" back from it was $320,-000, the trust's "selling price" to him. True, Judge Friendly's approach does avoid the potential danger that *nobody* would be taxed on the difference between the grantor's original basis of $30,000 (which became the trust's basis) and the sum of $320,000; it does so by providing that the grantor pay tax on that gain as if he—like the trust—had elected installment treatment under § 453. But the problem with this approach is that it simply does not treat the grantor/taxpayer as if he were the "owner," which is what the statute requires. The difference is, of course, substantial. Were the taxpayer in this case, for example, truly treated as the owner of the stock, his basis would be that of the trust, *i.e.*, the "old" owner, or $30,000.

I would accordingly frame the ultimate question as follows: whether the grantor of a Clifford trust who is deemed the owner of the trust assets by virtue of section 675(3), who sells those assets in the taxable year and realizes the proceeds of such sale (directly or indirectly), can take advantage of the trust's prior election to receive a portion of its proceeds from the taxpayer/grantor on an installment basis, or whether the taxpayer must report the entire gain in the year he in fact realizes it. Thus stated, the question seems to me to answer itself. A taxpayer must report a gain when he realizes it. The taxpayer did not realize his gain on an installment basis and is therefore disentitled to benefit from an installment election on the part of the trust.

In stating the question, I use the word "portion" advisedly. Suppose that the amount the taxpayer received on liquidation (attributable to the trust's shares) was in excess of $320,000. Even under Judge Friendly's proposed result, which would permit the grantor to treat the difference between the $320,000 received and the $30,-000 basis as an installment sale, the amount over and above $320,000 would surely be taxable to him as immediate, short-term capital gain.

But of course the gain on the difference between $30,000 and $320,000 is identical in kind to the gain between $320,000 and the amount ultimately received, once the benefits of the Clifford trust have been denied the taxpayer. After all, had the taxpayer never established a trust, he would have been required to report the entire difference as capital gain. He could not have elected to treat the sale on an installment basis for the simple reason that he did not receive the proceeds on an installment basis. Does it make any difference, then, that he did establish a trust which did not comply with the Clifford trust regulations, non-compliance with which triggered the statutory requirement that he be treated as the "owner" of the assets? In my view the answer has to be in the negative irrespective of the language in section 671 relied on by Judge Friendly as the sole basis for his conclusion.

I submit that the language of section 671, insofar as it includes in the grantor's taxable income "those items of income ... which are attributable to that portion of the trust," simply does not bear on, indeed it has nothing whatsoever to do with, the trust's election to treat gains on an installment basis. The "item of income" attributable to the grantor under section 671 is the difference between $30,000 and $320,000. How it is to be treated on his tax return is dependent on whether *he* realized it in the taxable year or deferred it by realizing it on an installment basis and taking the installment election. The fact that the taxpayer did not realize that gain in its entirety (as turned out to be the case) simply means that he only has to report it to the

extent that he did in fact realize it, not that he is entitled, as Judge Friendly's opinion would inconsistently hold, to treat the entire amount on an installment basis and to deduct the unrealizable portion in the year of his sale.

The grantor, Rothstein, was not himself an installment seller; nor is he to be deemed such by virtue of section 671. Yet under Judge Friendly's analysis, following a transaction after which Rothstein is to be treated as the owner of the assets in question, he is nevertheless allowed to take advantage of the trust's now meaningless election. Nothing in the statute, legislative history, regulations, or cases supports this anomolous result. In fact, the parties themselves did not even propose this result, which helps explain why nobody knew (or cared) on argument how the trust treated the transaction. From the trust's point of view and against any conceivable suggestion of "double taxation," I would simply point out that once the grantor is treated as the owner and the income or gain thus made attributable to him, there are no tax consequences to the trust, and any election it has made is purely moot. Judge Friendly's opinion does not, as I read it, suggest otherwise.

There is no problem with the grantor's payment of interest to the trust. Whether that payment is treated as a wash, as the Commissioner probably treated it, or whether the trust is perceived as receiving income, which is then functionally offset by allowing the grantor a deduction for interest paid to the trust, as Judge Friendly would have it, there are no tax consequences to either trust or grantor, which is as it should be, when, by virtue of the grantor's failure to comply with the Clifford trust regulations, he is treated as the owner of the assets involved.

While to affirm I would have to address the second or jury issue in this case, for a lone dissenter to address that question seems to me an academic exercise the usefulness of which cannot be great. To my mind, in any event, appellant's counsel ac-

quiesced in the trial court's treatment of the jury as an advisory one only.