649 F.Supp. 949 (1986)
Edward GRANNEMANN and Ruth Grannemann, Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. N85-0127C.
United States District Court, E.D. Missouri, N.D.
September 29, 1986.
*950 Brown, Willbrand & Simon, P.C., B. Daniel Simon, Columbia, Mo., Wasinger, Parham & Morthland, Austin Parham, Hannibal, Mo., for plaintiffs.
Robert D. Metcalfe, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Wesley D. Wedemeyer, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court for determination on the merits based upon the parties' stipulation that the claim could be determined on the parties' cross-motions for summary judgment. The parties have waived trial by jury.
In general, plaintiffs seek a refund of paid taxes which plaintiffs contend were improperly assessed and collected. Upon the 1979 sale of their farm land and related personal property, plaintiffs assert that, pursuant to 26 U.S.C. § 453, they were entitled to use the installment sales method of reporting the income from that sale. Plaintiffs also seek an award of attorney's fees and litigation costs pursuant to 26 U.S.C. § 7430. Defendant contends plaintiffs were not entitled to use the installment sales method to report this income because sale proceeds were deposited with a bank in escrow and such funds must be treated as having been received by plaintiffs in the year of the sale.
Having carefully considered the record herein, including the pleadings, the parties' joint stipulation of uncontested facts, the parties' supplementary joint stipulation of uncontested facts, the relevant exhibits, and the parties' argument, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiffs, Edward and Ruth Granneman, are and were at all times relevant to *951 the present action husband and wife, residing in Chariton County, Missouri, which is within the Eastern District of Missouri.
2. Prior to December 18, 1979, plaintiffs were the owners of (a) real property located in Chariton County, Missouri, described as follows:
All the Southwest Quarter (SW¼) of Section Twenty-two (22) Township Fifty-four North (54N) Range Seventeen West (17W)
and (b) certain personal property located on that real property, and more properly described as:
Wheat crop (growing), all cattle watering systems, tanks and fountains (including automatic watering systems), all fences, 6 wire hog panels, window air conditioning unit in house, television tower, built in electric range and hood, smoke house and brooder house.
3. Prior to August 1979, plaintiffs decided they wanted to sell their farm, including the above-described real and personal property. At that time, they wanted to take the sales price in installments, paid over a number of years, rather than taking the sales price in cash in the year of sale, so they could minimize the capital gains taxes which they would otherwise be required to pay by reason of the sale. Plaintiffs' sole motivation to sell their farm on an installment plan was to qualify for the installment sales method of reporting income and to thereby reduce the capital gains tax that would otherwise be payable under a cash sale if plaintiffs received the entire amount of the sales price at the time of the sale in 1979.
4. In August 1979, plaintiffs listed their farm for sale with Walter S. Iman, a real estate broker who operated Iman Realty and Auction Service located in Chariton County, Missouri. The listing agreement recited a sales price of $360,000.00 for the farm, which plaintiffs then believed had a total of 160 acres. The total was based upon a sales price of $2,250.00 per acre. The terms of sale contained in the "Missouri Farm Listing Agreement" provided for the following schedule for payment of the principal amount of the sales price: ten percent in cash at closing; and the balance to be paid over a period of ten years at nine percent per annum.
5. In November 1979, Jimmie Webster, the land agent for the Associated Electric Cooperative (AEC) of Springfield, Missouri, a Missouri corporation, approached Walter Iman and, on behalf of AEC, offered to purchase plaintiffs' farm for a price of $2,000.00 per acre. AEC desired to acquire the farm in order to exchange it for a farm owned by John Bixenman. The Bixenman land contained coal that AEC desired to mine in its coal mining operation.
6. At the time of the offer to purchase the Grannemann farm, Mr. Webster offered either to pay the entire purchase price in cash ($320,000.00) upon closing of the purchase and sale, or to pay the purchase price in installments over several years. At the time the offer was made, AEC had the present ability to pay in cash the entire amount offered as its purchase price for the Grannemann farm.
7. At the time of AEC's offer, Walter Iman, acting on behalf of plaintiffs, informed Jimmie Webster that the purchase price of the farm would have to be paid in installment payments and that the Grannemanns would refuse to accept payment of the entire purchase price in cash in the year of the sale.
8. Plaintiffs also then indicated their desire that the obligation of AEC to pay to the Grannemanns the balance of the sales price in installments be secured or collateralized in some manner. In a transaction for the purchase and sale of a farm, the obligation to pay the installment payments representing the balance of the sales price would ordinarily be secured or collateralized by a mortgage or deed of trust upon the farm land. AEC was unable and unwilling to give a mortgage or deed of trust to the Grannemanns as security or collateral for the obligation to pay them the installment payments because (a) AEC was a party to a first mortgage given to the Rural Electrification Administration (REA) *952 and that mortgage automatically attached to all land then owned and all land later acquired by AEC; and (b) AEC was required to convey the plaintiffs' land to John Bixenman, free and clear of any encumbrance.
9. Mr. Jack Peace, an attorney for AEC, had developed an escrow arrangement which could be used to provide security for installment payments in lieu of a mortgage or deed of trust upon farm land. Under the terms of that escrow arrangement, AEC would enter into an "Escrow Agreement" with a local banking institution, and would deliver funds to that bank for investment or deposit in interest-earning deposits issued in the name of AEC and upon which AEC would earn and receive the interest. The terms of the escrow arrangement provided that if there was a default upon a promissory note given by AEC in part payment of the purchase price for the land, then the holder of the note would be entitled to present the note to the banking institution acting as the escrow holder, which would be required to pay the note. During the negotiations between plaintiffs and AEC for the purchase and sale of plaintiffs' farm, Mr. Peace proposed to Walter Iman that this escrow arrangement be used to secure or collateralize AEC's installment payments.
10. In November 1979, AEC agreed with Edward and Ruth Grannemann to purchase the real and personal property for the price of $2,000.00 per acre of farm land.
11. On November 19, 1979, plaintiffs and AEC executed a written sales agreement entitled "Contract for the Sale of Farm Land" (contract). The contract provided for the sale of 160 acres of farm land, in addition to the personal property, for the total purchase price of $320,000.00. Schedule A of the contract provided that the original purchase price of $320,000.00 would be paid by AEC to plaintiffs in the following manner:
(a) $32,000.00 would be deposited in escrow with the Iman Realty and Auction Service by AEC as an earnest money deposit, to be paid over to plaintiffs at the closing of the sale;
(b) AEC would pay an additional $56,160.00 to plaintiffs at the closing of the sale; and
(c) AEC would pay the balance of the purchase price, an amount determined to be $231,840.00, by tendering to plaintiffs four promissory notes in the amount of $57,960.00 each, which would bear interest in the amount of nine percent per annum, and which would be payable successively on January 15, 1980, January 15, 1981, January 15, 1982, and January 15, 1983. Schedule A provided that upon payment of each of the promissory notes given by AEC to plaintiffs, plaintiffs would mark the promissory note as "paid" and "cancelled," and return it to AEC. Schedule A of the contract further provided that on the date of the closing of the sale of the farm land, AEC would place "additional cash collateral of $231,840.00" into "an escrow account of the Salisbury Mercantile Bank established and owned by the buyer for the purpose of providing collateral to guarantee notes executed by Associated Electric Cooperative to the Seller."
12. A land survey of the relevant real property was made in December 1979. It established that the actual area of the real property was 165.05 acres. To reflect the increased acreage, the contract and Schedule A thereto were subsequently amended in the following manner:
(a) the total purchase price was raised from $320,000.00 to $331,000.00, to reflect the price of $2,000.00 per acre;
(b) the additional payment of cash due at the time of the closing of the sale was raised from $56,160.00 to $60,800.00;
(c) the balance of the purchase price due after the closing of the sale was raised from $231,840.00 to $238,200.00; and
(d) the face value of each of the four promissory notes, which together represented the balance of the purchase price due after the closing of the sale, was raised from $57,960.00 to $59,550.00. The earnest *953 money amount of $32,000.00 was not changed.
13. The use of Salisbury Mercantile Bank (bank) as the escrow agent was suggested by Walter Iman and agreed to by plaintiffs and AEC. AEC had no account with the bank other than a small courtesy bank account. The Grannemanns were not and had never been shareholders, employees, or directors of that bank. The Grannemanns and Walter Iman were and had been depositors with the bank. All of the stock of the bank, with the exception of the qualifying shares owned by its directors, was owned by Mercantile Bancorporation, a large holding company. The Salisbury Mercantile Bank agreed to serve as the escrow agent without any fee in anticipation of the deposits that it would receive from AEC under the escrow agreement.
14. Prior to the closing of the purchase and sale of the farm, Mr. Peace drafted both the escrow agreement, which was signed at the closing, and the four promissory notes, which were delivered by AEC to the Grannemanns at the time of closing. Prior to the closing, Mr. Peace submitted a draft of the escrow agreement to Mr. Don Reynolds, president of the bank, and the draft was approved by Mr. Reynolds for the bank.
15. The closing took place at the offices of Walter Iman on December 18, 1979. At that time, an escrow agreement, dated December 18, 1979, which had been previously signed by the president of AEC, was presented by Mr. Peace and was signed on behalf of the bank by Mr. Reynolds. Plaintiffs, although not parties to the escrow agreement, signed that agreement on the last page in order to acknowledge that they had read the agreement and understood its terms and conditions.
16. At the time of the closing, AEC made to plaintiffs the following cash payments:
(a) a total of $32,000.00 in earnest money, previously deposited in escrow with Iman Realty and Auction Service by AEC; and
(b) an additional cash payment of $60,800.00.
The following expenses were deducted from those cash payments:

Surveyor's fee $ 571.75
Preliminary survey work 31.85
Accountants' fee 20.00
Brokerage fee to Iman Realty &
 Auction Serv. 16,550.00
 __________
Total $17,173.60

Thus, at closing, plaintiffs received net cash in the total amount of $75,626.40 ($92,800.00 in cash payments, less $17,173.60 in expenses).
17. Also, at the time of the closing, AEC delivered to plaintiffs four promissory notes made payable, respectively, on January 15, 1980, January 15, 1981, January 15, 1982, and January 15, 1983. Each promissory note was in the amount of $59,550.00. Each of the four promissory notes provided for interest at the rate of nine percent per annum. Under the provisions of the notes, no event could cause the acceleration of the maturity dates of the notes.
18. At the time of the closing, plaintiffs delivered to AEC two general warranty deeds for two separate portions of the relevant real property.
19. AEC also delivered to the bank, as escrow agent, a check in the amount of $238,200.00 made payable to Salisbury Mercantile Bank for deposit in the escrow account in accordance with the terms of the escrow agreement dated December 18, 1979.
20. The escrow agreement recited that the escrow account created thereby was established in order to provide collateral for the payment of the four promissory notes referred to above. The escrow agreement further provided that the funds placed in the escrow account would be placed in interest-bearing deposits, and that all interest accrued thereon would belong to and be paid to AEC. By its terms, the escrow agreement provided that, upon presentation to the escrow agent, the Salisbury Mercantile Bank, of one of the promissory notes, the escrow agent was authorized to and would release and disburse to AEC a sum from the escrow account which *954 corresponded to the amount of the promissory note presented, plus any interest earned on any certificates of deposit or other securities that matured near the due date for the note so presented. The escrow agreement further provided that upon the presentation of the fourth and final note, due and payable on January 15, 1983, marked "paid," the balance of the funds in the escrow account, including any principal and accrued interest thereon, would be delivered by the bank to AEC. The escrow agreement also provided that if AEC defaulted in the payment of one of the promissory notes, the plaintiffs could, following the expiration of thirty days after the due date of the promissory note, present the promissory note to the escrow agent for payment. No other provisions were made in the escrow agreement for plaintiffs to obtain any part of the escrowed funds from the escrow agent. Under the provisions of the escrow agreement, no event could accelerate the times when the bank could release funds from the escrow deposit.
21. Other than those set forth in the escrow agreement, there were no agreements between and among AEC, plaintiffs, and Salisbury Mercantile Bank with respect to the administration or distribution of the escrow account.
22. After the closing on December 18, 1979, the sum of $238,200.00 received by the bank, as escrow agent, from AEC pursuant to the terms of the escrow agreement, were, at Mr. Peace's instructions, invested by the escrow agent as follows:
(a) the sum of $59,550.00 was deposited into a savings deposit account with the bank, in the name of Associated Electric Cooperative on December 18, 1979; and
(b) the balance of the funds received by the escrow agent were deposited in three certificates of deposit issued by the bank in the name of Associated Electric Cooperative in the amounts of $59,550.00 each, dated December 18, 1979, for terms of 182 days each, and providing for an interest rate of 11.769% per annum.
23. The Grannemanns looked to AEC as the primary obligor on the four notes for payment of each annual payment of principal and nine percent interest. AEC remained obligated to pay each of the four notes, and each of the four promissory notes was paid on its due date by AEC. The notes were paid with funds drawn from AEC's general accounts in Springfield, Missouri, and not with any funds drawn from the escrow account.
24. Following their receipt of a check from AEC for the principal amount of the promissory note on each of the note's respective due dates, with any interest accrued thereon, the plaintiffs endorsed the promissory note as "paid" and "cancelled," and returned the endorsed and cancelled promissory note to Jimmie Webster. Jimmie Webster presented the endorsed and cancelled promissory note to the escrow agent, the Salisbury Mercantile Bank, and received in return a bank money order made payable to AEC for the principal amount of the promissory note and any interest accrued on any certificate of deposit which had matured. All interest upon the escrow account accrued and was paid to AEC. None of the funds placed in the escrow account at the bank by AEC at the time of the closing were used by AEC to redeem the promissory notes given to plaintiffs. After receiving each bank money order from the bank, Jimmie Webster mailed the cancelled note and the bank money order to AEC's executive offices in Springfield, Missouri.
25. Plaintiffs were not paid any funds from the escrow account, and they received none of the interest from the funds invested in the escrow account. Plaintiffs never used the escrow account as security or collateral in any other transaction, or in order to obtain a letter of credit. Plaintiffs never gave the escrow agent any directions or instructions concerning the investment of the funds in the escrow account or the administration of the escrow account. Plaintiffs had no right to benefit from or to control the money invested in certificates of deposit in the escrow account. The access of plaintiffs to the escrow account was restricted in that they could derive funds *955 from the escrow account only in the event of default in payment of a note by AEC, and then only after an additional period of thirty days from when the default had expired.
26. The amounts of the payments for each of the four notes paid by AEC to plaintiffs on January 15th of each of the years 1980, 1981, 1982, and 1983 (which consisted of the principal sum of the note and interest on the unpaid balance of $238,200.00), and the amounts subsequently paid by the bank to AEC (which represented the principal sum of a certificate of deposit and accumulated interest), were as follows:

 Payment of Associated Payment of Bank to
 Electric to Grannemanns Associated Electric
January 15, 1980  $61,194.56 $59,966.32
January 15, 1981  75,628.50 65,497.57
January 15, 1982  70,269.00 75,311.45
January 15, 1983  64,909.50 84,977.90

27. The initial cash payment of $92,800.00 made by AEC to plaintiffs in 1979, the year of the closing of the sale, did not exceed thirty percent of the total sales price of the farm.
28. In 1980, the plaintiffs filed their joint U.S. Individual Tax Return (Form 1040) for the taxable period ending December 31, 1979, reporting the amount of $25,324.00 as a long-term capital gain on the installment sale of their farm.
29. In 1983, the Internal Revenue Service caused the joint individual tax returns (Forms 1040) of the plaintiffs for the 1979, 1980, and 1981 taxable years to be examined. As a result of the examination, the Internal Revenue Service determined that plaintiffs were not entitled to utilize the installment sales method of 26 U.S.C. § 453 in reporting the income received in the taxable years 1979, 1980, 1981, 1982, and 1983. The Internal Revenue Service determined that plaintiffs had realized a long-term capital gain in connection with the sale of their farm land in the 1979 taxable year, the year of the sale, in the amount of $254,241.33. The Internal Revenue Service also made certain adjustments to the amounts of income received by plaintiffs in the 1980 and 1981 taxable years, which resulted in a decrease in the amount of $4,188.00 for the 1980 taxable year, and a decrease of $5,197.00 for the 1981 taxable year.
30. By reason of the Internal Revenue Service's determination that the sale of plaintiffs' farm did not qualify for the installment sales method of 26 U.S.C. § 453, the Internal Revenue Service assessed plaintiffs with a deficiency in their joint individual income taxes for the year 1979 in the sum of $52,296.90.
31. By reason of such deficiency as determined by the Internal Revenue Service for the plaintiffs' joint individual income taxes for the year 1979, plaintiffs have made payment of additional taxes and interest in the total sum of $63,723.92 as follows:

 Date of Payment Amount of Payment
March 11, 1983 $52,273.29
September 1, 1983 11,020.08
January 20, 1984 57.21
January 15, 1985 373.34
 __________
 Total $63,723.92

32. The following amounts, representing adjustments in the nature of credits proposed by the Internal Revenue Service to the plaintiffs' joint individual income tax for the 1980 and 1981 taxable years, were applied in payment of the assessed taxes and interest on the dates indicated:

 Amount Date Credit Applied
$ 23.61 April 15, 1981
 9,361.00 August 18, 1983

Additionally, on September 14, 1984, a total of $3,021.63, representing interest due on *956 the "credit" amounts, was applied in payment of the assessed taxes and interest.
33. On September 20, 1983, plaintiffs filed with the Internal Revenue Service a timely claim for a refund (Form 1040X) of the tax and interest. On May 8, 1984, the Internal Revenue Service fully disallowed plaintiffs' claim for refund. Plaintiffs have made no assignment of their claim for a refund of tax and interest and have exhausted all administrative remedies with respect to the assessment of the additional income taxes.
34. The parties have stipulated that if plaintiffs prevail herein, then plaintiffs would be entitled to recover the sum of $63,723.92, together with interest, on the following amounts of payments from the following dates:

Date of Payment Amount of Payment
March 11, 1983 $52,273.29
September 1, 1983 11,020.08
January 20, 1984 57.21
January 15, 1985 373.34
 __________
 Total $63,723.92

Conclusions of Law
1. Pursuant to 28 U.S.C. § 1346(a)(1), this Court has jurisdiction over the claim; and pursuant to 28 U.S.C. § 1391(e), venue is proper in the Northern Division of the Eastern District of Missouri.
2. In the 1979 taxable year, 26 U.S.C. § 453 provided in relevant part as follows:
(a)(1) Under regulations prescribed by the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.
* * * * * *
(b)(1) General Rule.  Income From 
(A) a sale or other disposition of real property, or
(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a).
(2) Limitations.  Paragraph (1) shall apply only if in the taxable year of the sale or other disposition 
(A) there are no payments, or
(B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.
3. Here, the parties do not dispute that plaintiffs received in cash less than thirty percent of the selling price in the year of the sale. For purposes of 26 U.S.C. § 453(b)(2)(B), the relevant inquiry is whether plaintiffs received in 1979 more than thirty percent of the sale price by virtue of the establishment of an escrow account, in the year of sale, containing cash in the total amount of the balance due on the sale as security or collateral for payment of the outstanding balance due pursuant to the buyer's promissory notes payable in subsequent years.
4. The purpose of the installment method for reporting income is to provide the taxpayer relief by matching the payment of the tax to the receipt of the sales price. Lustgarten v. Comm'r, 71 T.C. 303, 309 (1978), aff'd, 639 F.2d 1208 (5th Cir. 1981); see Rhodes v. United States, 243 F.Supp. 894, 898 (W.D.S.C.1965); see also Comm'r v. South Texas Lumber Co., 333 U.S. 496, 503, 68 S.Ct. 695, 699-700, 92 L.Ed. 831 (1948) (interpreting pre-1954 Internal Revenue Code installment reporting provision). Defendant argues that plaintiffs violated the purpose and scope of 26 U.S.C. § 453 by voluntarily choosing not to accept AEC's offer to pay the full purchase price in cash in 1979 and by insisting on the installment payments solely to reduce the tax consequences of the sale. See Pozzi v. Comm'r, 49 T.C. 119 (1967); see also Griffiths v. Helvering, 308 U.S. 355, 357, 60 *957 S.Ct. 277, 278, 84 L.Ed. 319 (1939). The attorney who drafted the escrow agreement did a skillful and thorough job, and appears to have had in mind these two cases cited by defendant, as well as several others decided in the last twenty years. As plaintiffs point out, tax mitigation through the use of 26 U.S.C. § 453 is permitted, even at the taxpayer's insistence and solely to reduce taxes, so long as the taxpayer actually enters into an installment sale that complies with the statute's requirements. Rushing v. C.I.R., 441 F.2d 593, 598 (5th Cir.1971); Roberts v. C.I.R., 643 F.2d 654, 657 (9th Cir.1981); see Sprague v. United States, 627 F.2d 1044, 1049-50 n. 10 (10th Cir.1980); Pozzi, supra, 49 T.C. at 128. Thus, the intent of the taxpayer to reduce taxes and the willingness and ability of the purchaser to pay the full price within the year of sale do not alone support a finding that a particular sales transaction falls outside the parameters of 26 U.S.C. § 453. The seller may determine he will not sell his property at a given time if the income tax would be unduly burdensome or confiscatory. The fact the buyer has the funds with which to pay in full does not impose upon the property owner a duty to sell. In metropolitan areas, real estate owners regularly receive offers from solvent buyers to sell for cash and at an enormous profit. The right to refuse such sales through this date is unquestioned. Their right to sell on installment terms to mitigate the tax consequences is clearly established in the law, and to deny the land owners the right to proceed in this manner could well stultify community progress.
5. Defendant also urges that plaintiffs are ineligible for the installment method of reporting income because plaintiffs constructively received the entire price of their farm in the year of the sale. Since 26 U.S.C. § 453 is an exception to the general rule regarding the year for reporting income and must be construed strictly, Rhodes, supra, 243 F.Supp. at 898; see Cappel House Furnishing Co. v. United States, 244 F.2d 525, 529 (6th Cir.1957), defendant argues plaintiffs' constructive receipt[1] of more than thirty percent of the sale price through the establishment of the escrow fund renders 26 U.S.C. § 453 inapplicable to the sales transaction here. Williams v. United States, 219 F.2d 523 (5th Cir.1955); Williams v. United States, 185 F.Supp. 615 (D.Mont.1960); Pozzi, supra; Rev.Rul. 79-91, 1979-1 C.B. 179.
6. In Reed v. C.I.R., 723 F.2d 138 (1st Cir.1983), the United States Court of Appeals for the First Circuit determined that, for purposes of 26 U.S.C. § 453, an escrow arrangement to defer payment of a purchase price effectively shifts income to the year of actual receipt, rather than the year of deposit in escrow, provided that:
(1) the escrow arrangement is part of a bona-fide, arms-length agreement between the purchaser and seller calling for deferred payment; (2) the seller receives no present beneficial interest (e.g. investment income) from the purchase funds while they are in escrow; and (3) the escrowee is not acting under the exclusive authority of the taxpayer.
Id. at 149. Cf. Rushing v. C.I.R., 52 T.C. 888 (1969), aff'd, 441 F.2d 593 (5th Cir.1971) (creation of trust did not prohibit use of installment method where taxpayers were deprived of the immediate right to the trust funds, the trustee was independent of taxpayers' control, and taxpayers had no manner of obtaining benefit from the funds except through the installment payments); accord Roberts, supra (adopting Rushing in a trust situation). In particular, the First Circuit found that an escrow arrangement agreed upon by the buyer and sellers *958 prior to consummation of the sale whereby the buyer deposited in escrow in one year the purchase amount and the escrow agent disbursed the money to sellers the next year, with no condition precedent to disbursement except the passage of time and with sellers not entitled to receive any benefit (e.g., interest, investment income, or letter of credit) on the sale proceeds while they were in escrow, satisfied the requirements of 26 U.S.C. § 453. The Court distinguished Williams v. United States, 219 F.2d 523 (5th Cir.1955), on which defendant here relies, by noting the escrow arrangement in Williams was established unilaterally by the seller-taxpayer after the sales contract was executed. Reed, supra, 723 F.2d at 143.
This Court finds the reasoning of Reed persuasive. Moreover, the tax court has acknowledged "that payments in escrow which are indeed intended and regarded solely as security for promissory notes are not payments for section 453 purposes." Porterfield v. Comm'r, 73 T.C. 91, 95 (1979) (finding the installment method applicable where the parties' intent and the actual application of the arrangement showed the escrow fund was established as collateral for the buyer's obligations and the taxpayer looked to the buyer as the primary debtor); accord Oden v. C.I.R., 56 T.C. 569 (1971) (substance of transaction did not comport with the form so taxpayers ineligible for 26 U.S.C. § 453 treatment).
7. Here, prior to the closing date, and as a result of arms-length negotiations to protect the taxpayers' interest in minimizing taxes and the buyer's interest in obtaining the property free and clear of encumbrances, the buyer and sellers agreed to establish an escrow account as security for the payment of the buyer's promissory notes. The Grannemanns received no benefit from the escrowed funds, either during escrow or upon termination of the escrow arrangement. The escrow arrangement was not actually or implicitly under the control or influence of the Grannemanns. The Grannemanns looked to AEC, and not the escrow fund, for payment of the notes, and AEC paid the notes from funds other than those in escrow. Both in operation and in the parties' intent, this transaction qualifies for the installment method of reporting income.
8. To the extent defendant argues earlier authority directly supports defendant's position, e.g. Pozzi, supra; Rev.Rul. 79-91, supra, the Court disagrees. As plaintiffs argue, the more recent tax court opinions have relied on the parties' intention to determine whether an escrow account is permissible security or impermissible payment. Here, the parties' intention and the actual transaction regarding the escrow account evince an arrangement to provide collateral for subsequent payments. Moreover, the situations are factually distinguishable in terms of (a) the timing of the sale and the effort to enter into an escrow arrangement; or (b) the control of the taxpayer over and the taxpayer's access to the escrowed funds.
Accordingly, plaintiffs' "second alternative" motion for summary judgment[2] will be granted and defendant's motion for summary judgment will be denied.

*959 ORDER
A memorandum dated this day is hereby incorporated into and made a part of this order.
IT IS HEREBY ORDERED that plaintiffs' second alternative motion for summary judgment be and the same is granted.
IT IS HEREBY FURTHER ORDERED that summary judgment be and the same is hereby entered in favor of plaintiffs and against defendant on plaintiffs' claim herein in the total amount of $63,723.92, plus interest on the following payments made on the dates indicated: $52,273.29 payment made on March 11, 1983; $11,020.08 payment made on September 1, 1983; $57.21 payment made on January 20, 1984; and $373.34 payment made on January 15, 1985, together with plaintiffs' costs.
IT IS HEREBY FURTHER ORDERED that counsel for the parties shall confer, and on or before October 2, 1986, shall notify the Court in writing whether a hearing will be necessary on plaintiffs' request for an award of attorneys' fees. If counsel advise that such a hearing is necessary,
IT IS HEREBY FURTHER ORDERED that a hearing on plaintiffs' request for an award of reasonable attorneys' fees and costs, pursuant to 26 U.S.C. § 7430, be and the same is scheduled for Tuesday, October 21, 1986, at 9:30 a.m., at the federal courthouse, 801 Broadway, Hannibal, Missouri.
On or before October 7, 1986, plaintiffs shall, if necessary, supplement their itemization of fees and expenses incurred herein. On or before October 14, 1986, defendant shall respond thereto and shall include a statement, no more than ten pages in length, supporting its position on plaintiffs' request. (In addition to filing its response with the Clerk of the Court in St. Louis, defendant shall mail a copy of its response to the federal courthouse in Hannibal, Missouri.)
On or before October 17, 1986, the parties shall confer and shall file with the Court a list of witnesses, a list of proposed exhibits, a brief statement of the parties' position(s) on this request, a joint stipulation of any facts and/or issues that may be resolved amicably, see, e.g., 26 U.S.C. § 7430(c)(2)(B) (allowing parties to agree that a party is a prevailing party for purposes of such an award), and a brief list of the issue(s) that remain for the Court's determination. (Again, the pleadings required in this paragraph shall be filed with the Clerk of the Court in St. Louis, with copies mailed to the federal courthouse in Hannibal, Missouri.)
IT IS HEREBY FURTHER ORDERED that plaintiffs' first alternative motion for summary judgment be and the same is denied.
IT IS HEREBY FURTHER ORDERED that defendant's motion for summary judgment be and the same is denied.
NOTES
[1] Treasury Regulation 1.451-2(a) defines "constructive receipt" as follows:

income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.
[2] Plaintiffs' motion for summary judgment consists of a "first alternative" and a "second alternative." The first alternative summary judgment motion asks for an award of the stipulated amount due, plus a "sum of plaintiffs' attorneys' fees and expenses of litigation incurred herein in the sum of $12,350.05, and for their costs." Plaintiffs have submitted with their motion an affidavit and itemization to support their request for an award of $8,920.00 in attorneys' fees for services rendered, and an award of $3,430.05 for expenses incurred in this litigation. Defendant has not filed a response to the request for fees and expenses. Plaintiffs' second alternative motion for summary judgment asks for an award of the stipulated amount due, plus costs "and for an Order setting this case for a hearing as to the sum of Plaintiffs [sic] reasonable attorneys' fees and expenses incurred herein." Under the circumstances, the Court considers it reasonable to provide an opportunity for response to plaintiffs' documented request for an award of fees and expenses, and to provide the requested hearing on Tuesday, October 21, 1986, at 9:30 a.m., if such a proceeding is deemed necessary after the parties confer on the request.